[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 8, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-14273

_____

D. C. Docket No. 99-00415-CV-J-10

JOHNNY L. ROBINSON,

Petitioner-Appellant,

versus

MICHAEL W. MOORE, Secretary,
Department of Corrections,
ROBERT BUTTERWORTH,
Florida Attorney General,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 8, 2002)**

Before EDMONDSON, Chief Judge, CARNES and HULL, Circuit Judges.

HULL, Circuit Judge:

Johnny L. Robinson appeals the denial of his § 2254 petition challenging his

death sentence. After review and oral argument, we affirm.

# I. BACKGROUND

During 1986, Robinson was convicted in the Circuit Court of St. Johns County, Florida of first-degree murder, kidnapping, armed robbery and sexual battery of Beverly St. George, and was sentenced to death on the murder conviction. On direct review, the Florida Supreme Court reversed his death sentence. Robinson v. State, 520 So.2d 1 (Fla. 1988) ("Robinson I").

During the resentencing on remand, the State argued that several statutory aggravating circumstances warranted the death penalty in Robinson's case.[1] A jury again recommended death, by a vote of eight to four.[2] The state trial court accepted that recommendation and imposed the death penalty. The Florida Supreme Court affirmed Robinson's death sentence. Robinson v. State, 574 So.2d 108 (Fla. 1991) ("Robinson II").

Subsequently, Robinson brought a Rule 3.850 motion in state court challenging again his murder conviction and death sentence. The 3.850 court denied relief, and the Florida Supreme Court affirmed that denial. Robinson v.

---

[1]See Fla. Stat. Ann. § 921.141(5) (setting forth statutory aggravating circumstances).

[2]The initial jury recommended death by a vote of nine to three. Under Florida's capital sentencing scheme, "the jury makes a recommendation on whether life imprisonment or execution is the proper punishment." Van Poyck v. Dep't. of Corrs., 290 F.3d 1318, 1321 n.3 (11th Cir. 2002) (discussing Fla. Stat. Ann. § 921.141). While that recommendation is entitled to "great weight," the trial court "ultimately decides for itself whether the imposition of the death penalty is appropriate." Id.

State, 707 So.2d 688 (Fla. 1998) ("Robinson III"). The Florida Supreme Court determined that no reasonable probability exists that the mitigation evidence gathered post-resentencing and presented to the 3.850 court would have altered the balance of aggravating and mitigating factors in this case. Id. at 695-97. The Florida Supreme Court affirmed the 3.850 court's determination that Robinson had not demonstrated the prejudice necessary to mandate relief. Id. at 697.

Robinson then filed a § 2254 petition, which the district court denied. This Court granted a certificate of appealability as to whether Robinson received ineffective assistance of counsel during resentencing. The crux of Robinson's claim is that his counsel failed to investigate and present available mitigation evidence. Thus, we first review (a) the aggravating and mitigating evidence presented during resentencing and (b) the newly-gathered mitigation evidence in the state 3.850 hearing. We then explain why the district court properly concluded that the Florida Supreme Court's decision — that Robinson had not demonstrated the prejudice necessary to mandate relief — was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. See 28 U.S.C. § 2254(d)(1).

## II. RESENTENCING TRIAL

### A. Aggravating Circumstances

#### 1. Testimony of Accomplice Fields

During resentencing, the State read to the jury portions of Clinton Bernard Fields's testimony from the guilt phase, which detailed how Robinson murdered Beverly St. George.[3] According to Fields, he and Robinson were at a party on the night of August 11, 1985. After leaving that party together, Robinson and Fields were driving on Interstate 95. While driving, Robinson and Fields saw a green car parked in the emergency lane. Robinson, who was driving, pulled over, "walked up to the green car . . . [and] opened the door and put a handgun out his pants." Robinson came back with "this girl in his hand," and "[h]e had the gun on her . . . you know, pointing at her, aimed at her." Robinson got into the back seat of his car with the woman, put handcuffs on her, and told Fields to drive away. The woman was later identified as Beverly St. George.

Subsequently, Robinson again took over the driving and drove to the Pellicer Creek Cemetery where he took the handcuffs off of St. George and told her to take off all her clothes. St. George then "got on the hood of the car," and Robinson

---

[3]Fields testified during the guilt phase, but invoked his Fifth Amendment right not to testify during Robinson's resentencing.

"put his penis inside her." After Robinson "got off her," he told Fields "to go ahead and get it, get on her." Fields told Robinson that he "don't really need it, because I got a girlfriend." Robinson then "raised his voice," and told Fields to "just go ahead on." Scared by Robinson, Fields "went ahead and put it in her and pulled it back out." When Fields finished, Robinson "got back on her" and had sex with St. George a second time. While having sex, Robinson "had the gun in his hand lying on the hood of the car, [and] had his hand over the gun."

Fields explained that during the sex with Robinson, St. George could see the gun that Robinson had in his hand. Fields described how St. George appeared scared, and that, on the way to the cemetery, St. George asked repeatedly whether they were going to kill her. According to Fields, "she was begging, you know, 'Is you-all going to take me back to my car? Is you-all going to kill me or what?'" Fields assured her they would not kill her.

After raping St. George a second time, Robinson expressed concern that St. George could later identify them. Fields responded, "Well, it's dark. You know, ain't no way she could do that there, you know." Robinson disagreed, stating, "Well, only way she can't do that there, I just go ahead and kill the bitch." Robinson then "walked up to her and put the gun to her cheek." At that point, Fields turned his head. Fields "heard the shot went off, and then . . . seen her

5

laying on the ground there. And then he [Robinson] standing over her and gave her another shot." As to the first gunshot, Fields clarified that Robinson "put it to her head right there, to her cheek, and he pulled the trigger." As to the second gunshot, Fields explained that "she fell on the ground" and Robinson "just stand over her and, pow, shot her again."

After shooting St. George twice, Robinson told Fields, "That's what I had to do. You know, if I didn't, you know, she know how I look, you know, and could identify my car, you know." Robinson then told Fields, "Now, she can't do none of that." Thereafter, Robinson and Fields drove to a dark road, where Robinson took money out of St. George's purse and burned her "purse, . . . underwears and some papers, some other stuff." Robinson then took Fields back to Fields's mother's house. At some point along I-95, Robinson threw the murder weapon into a wooded area.[4]

---

[4]Robinson stipulated that he fired the fatal shots with a .22 caliber Ruger pistol. His stipulations were read to the resentencing jury, as follows:

> Stipulation of facts. That Johnny Leartrice Robinson did on or between August 11 and 12, 1985, at Pellicer Creek Cemetery within St. John's County, Florida, have in his possession the .22 caliber Ruger pistol with which Beverly St. George, a human being, was fatally shot.

> The .22 long rifle Remington shell casing found at the cemetery was fired in and ejected by said firearm. That Johnny Leartrice Robinson did fire the said firearm twice and that both shots struck the said Beverly St. George in the head, fatally wounding her. The State of Florida has never found and recovered the said firearm used by Johnny Leartrice Robinson.

6

Portions of Fields's testimony on cross-examination during the guilt phase were also read to the resentencing jury. According to that testimony, (1) Fields was also convicted of first-degree murder, kidnapping, rape, and armed robbery, (2) Fields "got life, not death," and the State had promised Fields "some slack" with regard to sentencing for his rape, robbery, and kidnapping convictions, and (3) Fields was granted use immunity for his testimony against Robinson.

### 2. *Testimony of Investigator West*

Charles West, the lead investigator, testified during the resentencing. West found St. George "lying kind of on her back, on her side . . . [s]he was wearing blue jeans, no shirt, and had two wounds to her head." West secured and videotaped the crime scene. Over Robinson's counsel's objection, that videotape was shown to the jury. West pointed out the blood around St. George's head area and the bullet wound over her left eye.

West further testified about Robinson's sworn, post-arrest statement, in which Robinson admitted shooting St. George twice, but claimed his first shot was

---

The Florida Supreme Court noted that "[o]ne week before Beverly St. George's murder, the weapon used to kill her was stolen in a burglary," and "[t]he state had substantial evidence indicating that Robinson was the burglar, and thus had the murder weapon." Robinson I, 520 So.2d at 4. Thus, "[t]o avoid the introduction of evidence of the prior burglary, the defense stipulated with the state that Robinson had fired the fatal shots." Id.

7

an accident.  Robinson's  post-arrest statement, published to the jury, provided as

follows:

On Sunday night, between 8:30 p.m. and 11:30 p.m., I was at a party drinking Henessey Cognac, some gin or vodka and beer.  I left at about 11:30 with Bernard [Fields].  We started to head for Orlando on 95 to see a girl I know there.

I saw a little green Plymouth with someone in it.  I turned around and went back and stopped.  I said, 'What's the problem?'  She said, 'No real problem' and that she was tired and stopped.  We talked and joked.  I had a gun stuck in my pants.  She said she needed something like that to kill this son of a bitch.  Later she explained it was her ex-husband.

I grabbed her by her arm and said, 'Come on' and she came.  And I went past Charlie T's [restaurant] and turned down a road.  There was a gate that was open.  And when I got in, I saw it was a cemetery.  We played around a little, and I got her out of her pants.

We got out of the car, and I took the gun out of my pants and laid it on the hood.  Me and the chick were on the front of the car.  And the kid said, 'Man, let's get out of here and take her back to the car.'  I said, "No, I'm going to take the bitch back to the party.'  And she said, 'Who the fuck are you calling a bitch?'  I said, 'Shut up, whore.'  The kid started to laugh, and she went to pawing at me.

I picked up my gun.  She was right against me, and I was trying to push her back.  The gun went off and hit her in the face.  She fell, and I called her and said, 'Hey, bitch, get up.'  She didn't say anything.  I got a flashlight.  She was lying on her side, and there was blood coming from her face.

I got scared.  Then I shot her again.  I had to.  How do you tell someone I accidently shot a white woman?  I hauled ass, started driving.  I drove and drove for maybe an hour, two hours.  Then I got my head straight and decided to rid of her stuff.  I don't remember where I was, but I threw her pocketbook, blouse and I don't recall anything else.

The next thing I knew, it was breaking day.  And I took Bernard [Fields] home.  Then I went home.  Monday afternoon when I woke up, I took a screwdriver and tore into the gun where you pull it back.  When I finished with it, it wouldn't cock or pull a bullet into it.  The

gun stayed under the seat of my car.  I couldn't figure out what to do with it.  The screwdriver's in my trunk.

> I was coming back from Orlando this morning on 8/17/85 around 1:00 and 2:00 o'clock this morning.  And somewhere between Daytona and Ormond Beach, I stopped the car on I-95 and flung the gun into the bushes.

West also testified about his post-arrest conversation with Robinson.  West asked Robinson why he had placed his firearm into his waistband before approaching St. George in her car.  Robinson replied, "Well, you know, a gun is a sign of power and authority."  While West generally agreed that Robinson was cooperative, West also indicated that Robinson already knew Fields was cooperating with the State.

### 3.  *Testimony of Medical Examiner*

The State also called Dr. Robert McConaghie, the medical examiner for St. Johns County, Florida.  McConaghie described the results of his autopsy of St. George, as follows:

> She was 5 and a-half feet tall, weighed approximately 125 pounds, was a young adult, white woman, about 30, 31 years of age. . . .
>
> She received two gunshot wounds to her face, one of which was in the – entered in the left cheek, traveled into the bottom of the skull through the mid-brain and ended up on the right side of the back of her head.
>
> The second bullet entered the left side of her forehead, went backwards into the right and also ended up in the back of the right side of the head.

There was extensive hemorrhage inside the skull. There was a bullet track going through both sides of the main lobes of the brain, the cerebral hemispheres and the middle portion of the brain, the medulla, had been penetrated twice, once by each bullet.

McConaghie further testified that St. George "died as a result of severe brain injuries inflicted by the gunshot wounds." Other than a scratch over her thumb and the two gunshot wounds, "there was no other significant injury" to her body. McConaghie also "saw no markings of any kind or indentations or injuries to her wrists, her hands, or her arms." While McConaghie did not notice any bruising around St. George's vaginal area, his examination did reveal that "spermatozoa were present," and that "[r]ecent sexual intercourse had taken place."

As to which bullet wound Robinson inflicted first, McConaghie had "the impression . . . that the bullet in the left cheek was the initial shot and the one in the forehead was the second shot."[5] Although St. George would have been rendered "immediately unconscious" after either bullet went into her head, McConaghie believed that "[d]eath from either of the shots would not have been instantaneous. It would have taken at least several seconds, perhaps up to a minute before death to

[5]This resentencing testimony comports with Fields's testimony. However, during the guilt phase, McConaghie was asked, "Can you tell by examining a person which gunshot was first or which gunshot was second?" He answered, "No." Robinson's counsel highlighted this apparent inconsistency while cross-examining McConaghie before the resentencing jury, and McConaghie admitted that "[t]here's no anatomic physical evidence to indicate which shot was fired first."

occur." St. George was probably still breathing after the first shot because "[t]here was blood found in her lungs that had to come from the back of the mouth, from the blood – from inside of the head. So she had to have breathed in that blood at least one breath and possibly more."

McConaghie also testified about the distance at which the gun was held each time St. George was shot. With regard to her left cheek, McConaghie testified that it was a "tight contact wound," explaining that the gun was "pressed to the cheek and pressed into the cheek."[6] That testimony was consistent with Fields's testimony that Robinson put the gun up against St. George's cheek. Robinson's counsel, however, posited another cause for the contact wound, which McConaghie could not rule out, as follows:

> DEFENSE: [W]e see a contact wound there and I think that is beyond question. However, what was moving to cause the pressure; that is to say, was the gun muzzle pushed forcefully toward her or was she moving toward the muzzle . . . Could she have been moving toward the gun . . . , rather than the person holding the gun pushing it against her face?

---

[6]McConaghie described his conclusion, as follows:
There's small abrasions up here which is consistent with the muzzle of a weapon, a laceration, small tear in the skin which is above that, which is consistent with the gas that escapes from a tight contact wound of the skin, the gas that's underneath the skin that swells up and you can see it tears. There is no powder around the wound there's no small particles or other things that come from a weapon that's fired. And this photograph [of the wound] is consistent with a tight gunshot wound.

McCONAGHIE: I have no way of knowing whether the gun was being pushed in or she was pushing toward the gun.

With regard to the bullet wound in St. George's forehead, McConaghie believed that the gun was held "one to two feet away."

4. *Testimony of Annette Eversole*

Annette Eversole lived with St. George, and is married to St. George's brother. By stipulation, a portion of her testimony from the guilt phase was read to the resentencing jury. According to Eversole, before St. George left home on August 11, Eversole saw St. George count out $197 in bills. St. George placed those bills in her billfold and placed that billfold in her black purse. Eversole had discussed money with St. George because she wanted "to be sure that [St. George] had enough to make the trip" to Quantico, Virginia. St. George was headed to Virginia for a hearing concerning the custody of her children. St. George left in a 1968 green Plymouth, a car with which she had previously experienced mechanical difficulties. Eversole later identified St. George's body at the medical examiner's office.

5. *Testimony of State Attorney for Maryland*

Also by stipulation, the State presented a portion of the guilt phase testimony of Edmund L. Widdowson, Jr., an assistant state attorney for Somerset County,

12

Maryland. Widdowson testified about Robinson's 1979 conviction for forcible rape in Maryland.[7] Robinson received a sentence of ten years in prison on that rape conviction, but was released early on parole. At the time of St. George's murder in 1985, Robinson was on "parole status" for his 1979 rape conviction.

**B.    Defense's Mitigation Evidence**

After the State rested, Robinson's counsel presented Dr. Harry Krop, a clinical psychologist familiar with Robinson's background. Krop met with Robinson during March 1986, before the initial sentencing, and again on December 9, 1988, before the resentencing. During those meetings, Robinson and Krop discussed Robinson's "past history." Krop did not administer standard psychological tests "because [Robinson's] history was particularly noteworthy in terms of his own self-report and there were some other documented aspects of his history already in the records that I reviewed." Krop further explained, "[P]sychological tests are used to primarily assist in diagnosis, and . . . based on the six hours that I spent with him, I felt comfortable and confident rendering a diagnosis without the use of a psychological test."

---

[7]Robinson pled guilty to this rape charge in Maryland, which alleged that he "did engage in vaginal intercourse with [the victim] by force and/or threat of force, against her will and without her consent."

13

A "large portion" of what Krop learned came from Robinson himself, but Krop also "spoke to some people that knew Mr. Robinson," despite the fact that "[i]t was not easy to get a hold of family members in this case . . . because of the nature of his background." Specifically, Krop spoke with (1) Robinson's biological father, the Rev. J.B. Robinson, (2) Coreen Smith, "a woman whom indicated . . . she was quite familiar with Mr. Robinson, at least as a youngster, because he spent a lot of time at her house," (3) Earl Smith, "[t]he boy that Mr. Robinson spent some time with, . . . [t]hat was Coreen's son, and I was able to speak with him as well whenever I called Ms. Coreen Smith," and (4) a sheriff's officer who knew Robinson from prison. Krop also reviewed (1) "a number of records from prior testimony and prior hearings," (2) Robinson's counsel's "entire file," (3) "a presentence investigation," and (4) Robinson's "Department of Corrections records."

Krop testified that the persons with whom he spoke, and the materials that he had reviewed, corroborated portions of what he and Robinson had discussed. Given its private nature, Krop explained that certain information could not be corroborated. Krop also clarified that (1) "the people who might know about some of these aspects of Mr. Robinson's background would most likely not be willing to share that information since it's not particular [sic] positive in terms of these other

14

people," and (2) "the person who probably knows the most about Mr. Robinson, that is the man who raised him, at least for part of his life, is no longer living. So, I wasn't able to obtain any information from that source."

Having testified in many capital cases, Krop indicated his familiarity with both the statutory and non-statutory mitigating circumstances a jury is entitled to consider under Florida law.[8] Krop did not believe there were any statutory mitigating circumstances in Robinson's case.[9] Krop, however, testified at length about Robinson's background and what he summarized as seven nonstatutory mitigating circumstances: (1) emotional deprivation; (2) physical abuse; (3) sexual abuse; (4) incarceration in an adult prison as a child; (5) psychosexual disorder; (6) intoxication at the time of the offenses; and (7) ability to function in prison without being a management problem.[10]

As to emotional deprivation, Krop explained that Robinson never knew his mother and he "was never really communicated with about his mother." Instead, Robinson was raised by his grandfather and grandmother, and then step-

---

[8]Robinson's counsel had used Krop in at least 25 to 35 capital cases. Krop also appeared in numerous capital cases for other defense attorneys, and occasionally for the State of Florida.

[9]The statutory mitigating circumstances under Florida law at the time of Robinson's resentencing are discussed in footnote 43 infra.

[10]What was then referred to as "nonstatutory mitigating circumstances" has since been codified as "[t]he existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty." Fla. Stat. Ann. § 921.141(6)(h).

15

grandmother.  This "was corroborated by Reverend Robinson[,] the biological

father, who . . . never told Mr. Robinson that the people who raised him were really

not his natural parents."  Krop considered Robinson to have "emotional

deprivation," and believed "that when one grows up essentially without a mother

and without getting love and affection, that would be a contributing factor; all

again contributing to later personality development."

While growing up, Robinson was subject to "considerable physical abuse,"

as well as emotional abuse.  Robinson's grandfather used "a black leather belt" and

"[t]here were instances in which Mr. Robinson had his hands tied together and a

switch was used on him."  Additionally, "the grandfather or the grandmother

would use a broom handle and have Mr. Robinson squat, put the broom handle

between his legs and have to basically sit in a squatting position."  In that squatting

position, Robinson was sometimes physically hit.  Coreen Smith indicated to Krop

that Robinson "would often come over to her son's house, her house, and stay

there for periods of time complaining that his [grand]father had hit him,

complaining about the abuse."  Smith also "saw the bruises on a number of

occasions," and told Krop that Robinson "would try and avoid going back home."

Robinson was also sexually abused.  When 7 years old, Robinson was

sexually abused by an uncle, but "he did not want to tell anybody about it because

16

he didn't want to be seen as queer." Robinson also thought that if he told his father about the sexual abuse, "that would lead to further physical abuse." When Robinson was 11 years old, his grandfather (in his 60's) married a 15 year-old-girl, and that girl also sexually abused Robinson "on a number of occasions." Legally, she "was his grandmother, but he perceived her as his stepmother, since the grandfather was . . . in the role of the father." Robinson had "extreme difficulty" in disclosing to Krop this sexual abuse. A few months after his grandfather's new wife moved in, at the age of 11 or 12 Robinson ran away and started living on the streets. Robinson lived at various migrant labor camps "at the age of 12 to 13 or 14 . . . during which time he again reports that he was sexually abused on a number of occasions by these individuals."

During this time period, Robinson also "began getting into legal trouble." Robinson once told the authorities he was 18 years old because he did not want to be sent back home. According to Krop, Robinson has "always been a fairly large individual. Apparently there was no way that they checked and he was ultimately incarcerated in an adult prison situation at the age of 13."[11] Robinson, having left

[11]Krop also testified as to his own belief that being incarcerated in an adult facility could be emotionally traumatic for a juvenile.

school in the sixth grade, finished his education in the prison system, where he obtained a GED and about 30 college credits.

Krop also offered the following diagnosis: while "there is no major form of mental illness," Robinson has "an antisocial personality disorder"[12] and "a psychosexual disorder."[13]  Krop further testified about Robinson's drinking and drug habits.  Robinson had not used drugs throughout his life and did not consider himself an alcoholic.  However, Robinson did admit to Krop that he had been drinking on the day and evening of the murder.  Robinson told Krop that he started

_____

[12]Krop described Robinson's antisocial personality disorder, as follows:
Mr. Robinson's behavior, both in terms of getting into trouble when he was in society, I would have to label him and diagnosis him as having personality disorders, specifically an antisocial personality disorder. . . . [W]hen an individual exhibits certain kinds of personality traits over a long period of time and those traits generally lead to the person either getting in trouble, or having difficulty functioning himself, then it is labeled as a personality disorder.  And certainly looking at Mr. Robinson's background, it's understandable . . . why he developed some of these personality traits, which unfortunately kept reenforcing his anger and his resentment and his feelings of rejection and inferiority.

[13]Krop described Robinson's psychosexual disorder, as follows:
Another diagnosis that I would certainly make, based on this incident, as well as previous background, is what we call a psychosexual disorder.  A psychosexual disorder is . . . a diagnosis given to an individual whose sexual behavior, either the behavior itself is inappropriate, such as forced sex, or the object or person to whom he is sexually attracted is inappropriate; such as a person who is attracted to young children . . . . [Here] we have the forced sex as an incurring [sic] incident.  Psychosexual disorder is certainly an appropriate diagnosis for Mr. Robinson.  Oftentimes we see individuals who suffer from psychosexual disorder as victims themselves of sexual abuse.  So, it certainly did not come as any surprise when Mr. Robinson . . . reported . . . his own victimization in terms of sexual abuse.

18

drinking around 4 p.m., when "he had a pint of Crown Royal." Robinson reported

having "anywhere from two, three or four cups . . . of liquor" at "a party," but he

was not sure "totally sure" as to the amount. Robinson also "drank maybe two or

three six-packs of beer, and . . . drank another pint of Crown Royal during the

night." Krop acknowledged that he had no "independent data" on exactly how

much Robinson had been drinking on the day and evening of the murder.

The final factor to which Krop testified on direct was how Robinson

functions in prison. Robinson reported to Krop that "he functions better and has . .

. been more productive in prison situations than he has in the community." In

prison, Robinson obtained his GED and "has been involved in some tutoring."

Robinson's probation officer told Krop that Robinson "does well . . . [and] is not a

management problem." Krop's review of Robinson's prison records confirmed

that he had no disciplinary reports.

During cross-examination, the State questioned Krop about whether

Robinson's self-reported history was corroborated by the other people with whom

Krop spoke. Krop admitted that he spoke with those individuals only on the night

before resentencing. Krop acknowledged that, while Coreen and Ernest Smith had

not directly observed the physical abuse of Robinson, both had seen bruises on

Robinson on several occasions. Krop agreed that his testimony about Robinson's

sexual abuse and emotional deprivation was based "almost entirely" on Robinson's self-reports, but Krop added that "the PSI's and various other records . . . certainly indicated that he did not have a natural mother in a household in which he grew up." As to the sexual abuse, Krop stated that "any report of sexual abuse is generally from the person, himself or herself." Krop added that Robinson "was very reluctant to have me or counsel contact his family members[,] . . . indicating that he did not want them to be involved and he did not feel that they were particularly relevant." According to Krop, "[i]t was only by persuasion of both Mr. Pearl [Robinson's counsel] and myself that he gave us at least two names of people we contacted."

The State also questioned why Krop considered the following factors "mitigating": (1) long-time incarceration, (2) intoxication at the time of the offenses, and (3) ability to function well in jail. The State characterized these factors as "self-induced type factors" not properly considered in mitigation. As to intoxication, Krop acknowledged that Robinson's report was "somewhat different" during his second interview in that it indicated Robinson had drank more (and started drinking earlier), but Krop noted that his questions to Robinson about drinking were also different during that second interview.

20

The State also focused on certain statutory aggravating circumstances, namely Robinson's having killed St. George to avoid arrest. The State asked Krop whether Robinson indicated he shot St. George a second time to avoid prosecution, as Fields had testified. Robinson indicated to Krop that he "would like to believe" he fired the second shot so St. George would not suffer, but Robinson "didn't deny" the possibility that he shot St. George a second time to eliminate her as a witness.

On re-direct, Krop testified about other facts he believed to be mitigating. Krop stated that Robinson is taking more responsibility for his actions and is less hostile than when Krop first met him. Krop mentioned Robinson's kindness towards others and good deeds. For example, Krop testified that (1) Robinson was helpful in the county jail system in "terms of at least four incidents in which there were [sic] potential [for] violence," and Robinson quelled that violence, and (2) Robinson helped others in prison obtain their education or GED.

Robinson's counsel also questioned Krop about Robinson's employment record, which to some extent was listed in Robinson's PSI that Krop reviewed. Krop stated, "I'm not aware of any formal employment, but I did not note that in the record." Robinson's counsel pressed further as to Robinson's work history, asking whether it was true Robinson repaired automobiles. Krop replied, "I

21

believe that I saw that in – as part of the training that he received or was noted, and that's a skill of his in his records."[14]

## C.    Closing Arguments

During closing arguments, the State argued to the jury that Robinson's conduct supported these six statutory aggravating factors: (1) murder committed by a person under sentence of imprisonment, because Robinson was on parole for his prior rape conviction; (2) murder committed by a person who had previously been convicted of another felony involving the use or threat of violence to some person, because Robinson had a prior rape conviction; (3) murder committed in the course of a kidnapping and sexual battery, because Robinson took St. George at gunpoint and in handcuffs and raped her; (4) murder which is particularly wicked, evil, atrocious, or cruel, because Robinson handcuffed St. George "immediately," raped her "time after time," terrorized her, and put the firearm "up to her cheek," while St. George begged for her life; (5) murder committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification, because Robinson took St. George to a desolate area with a murder weapon he procured before he first approached her, shot her twice because he thought she might later

---

[14]In a section entitled "EMPLOYMENT," Robinson's PSI listed his "occupation" as "auto mechanic." The PSI further stated that "[t]he defendant is an auto mechanic who works primarily for labor contractors, garages, and used car lots on an as needed basis," and that Robinson had "numerous" jobs in the past two years. Krop reviewed this PSI before testifying.

identify him, and committed the murder even though St. George did not resist or provoke him; and (6) murder committed to avoid arrest, because Robinson shot St. George so that she could not identify him as her rapist or kidnapper. It was these aggravating factors, the State argued, that warranted "the ultimate punishment and nothing less."

In closing, the defense argued that the particular circumstances under which Robinson had committed the crimes at issue were subject to a great deal of doubt, even though the resentencing jury had to accept the fact that Robinson had been convicted. The defense emphasized that Fields's and Robinson's accounts were different, and that Fields was not necessarily telling the truth because he had something to gain for testifying against Robinson. Characterizing the veracity of Fields's testimony as "the key" to certain statutory aggravating circumstances, the defense pointed out certain inconsistences in Fields's testimony. The defense also argued that some evidence suggested certain aggravating circumstances did not exist.

The defense walked through its mitigation evidence, pointing out that Krop "outlined horror, almost unbelievable childhood for this man, Johnny Robinson, which resulted in the man you see today." The defense highlighted the physical, sexual, and emotional abuse Robinson suffered as a child, and that Robinson

essentially grew up on the streets. The defense also discussed the other mitigating circumstances to which Krop testified, including Robinson's intoxication at the time of the offenses, his emotional deprivation and psychosexual disorder, his incarceration in an adult prison as a child, his ability to function in the prison system, and, in certain situations, Robinson's kindness towards others. The defense further noted that, since his offenses, Robinson had matured and taken responsibility for his acts.

**D.    Death Sentence**

After deliberating, the resentencing jury recommended death by a vote of eight to four. Thereafter, the state trial court imposed the death penalty, finding the six statutory aggravating circumstances the State had argued and no statutory mitigating circumstances.

Although noting much of the mitigation evidence came only from Robinson's self-reports to Krop, the trial court found these three nonstatutory mitigating circumstances: Robinson (1) had a difficult childhood; (2) suffered physical and sexual abuse during childhood; and (3) had a psychosexual disorder. The trial court declined to find that Robinson was intoxicated at the time of the offenses because it was "not supported by the evidence." The trial court also found "no credible evidence that [Robinson] was incarcerated as a child in an adult

24

prison." Although acknowledging Robinson "functions well in prison," the trial court determined that this good behavior "is not in mitigation of the crime."

The state trial court also specifically noted that, in Robinson's case, "the aggravating circumstances are overwhelming." The trial court reasoned that Robinson was on parole for a prior rape, and yet he terrorized, raped, robbed, and murdered St. George, a total stranger. The trial court emphasized that "St. George, except as a witness, was no threat to" Robinson, and "[s]he was killed for the specific purpose of eliminating her as a witness."

### III. DIRECT APPEAL OF RESENTENCING

On direct appeal, the Florida Supreme Court affirmed the trial court's resentencing. Robinson II, 574 So.2d at 109. The Florida Supreme Court rejected Robinson's claims of error, including his claim "that he should have been permitted to establish his intoxication at the time of the crime solely through the testimony of Dr. Krop." Id. at 111. The Florida Supreme Court reasoned that "Robinson's hearsay statement to the doctor during a medical interview, in the absence of any evidence of impairment at trial, is insufficient to establish the existence of this mitigating circumstance." Id. (emphasis in the original).

On direct appeal, Robinson also argued that three of the six aggravating circumstances were unjustified. The Florida Supreme Court agreed in part, finding

25

"that the trial court erred in finding that this murder was heinous, atrocious, or cruel." Id. at 112. Yet the Florida Supreme Court was "not persuaded that the outcome would be any different in light of the specific aggravating circumstances remaining – murder committed by a person under sentence of imprisonment; murder committed by person previously convicted of a violent felony; murder committed in the course of sexual battery and kidnapping; murder committed to avoid arrest; and murder committed in a cold, calculated, and premeditated manner." Id.

## IV. STATE 3.850 PROCEEDINGS

On May 11, 1993, Robinson filed his Motion to Vacate Judgment of Conviction and Sentence pursuant to Florida Rule of Criminal Procedure 3.850. In that Rule 3.850 motion, Robinson alleged, inter alia, ineffective assistance of counsel during his resentencing. The crux of Robinson's claims was that his trial counsel failed to investigate and present available mitigation evidence. During an evidentiary hearing, the 3.850 court heard testimony from (1) trial counsel Howard

Pearl, who is now deceased, (2) Krop, and (3) two potential mitigation witnesses.[15]

We now review that testimony.

## A.    Testimony of Howard Pearl

Howard Pearl was Robinson's lead trial counsel.[16]  Since 1972, Pearl had

been an assistant public defender in Florida's Seventh Judicial Circuit, where

Robinson was tried.  From 1978 to 1993, Pearl was assigned to capital cases.

During that fifteen-year period, Pearl defended 300 capital cases.  Of those 300

capital cases, Pearl tried somewhere between 90 and 100 cases before juries, all

within Florida's Seventh Judicial Circuit.  Robinson's capital case came to Pearl

during the middle of Pearl's career.

In this case, Pearl relied, in large part, on Krop to investigate potential

mitigation witnesses.  Pearl testified that "[t]here are times when strategically we

feel that while the witness . . . might be highly reluctant to talk to a Public

_____

[15]The 3.850 court also heard testimony from (1) Thomas E. Cushman, Fields's lawyer, and (2) Pat Doherty, a lawyer who offered his expert opinion as to whether Pearl had performed effectively during resentencing.  Their testimony is not relevant to whether Robinson demonstrated the prejudice necessary to mandate relief.  Thus, we do not review it.  See also Freund v. Butterworth, 165 F.3d 839, 863 n. 34 (11th Cir. 1999) (en banc); Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998).

[16]Chris Quarles, second chair during Robinson's resentencing, also testified.  Like Pearl, Quarles had a wealth of experience as a public defender in Florida's Seventh Judicial Circuit. Quarles handled both of Robinson's direct appeals to the Florida Supreme Court.  However, Quarles's role during resentencing was limited, and Quarles had no responsibility to investigate or to prepare for the resentencing.

Defender investigator or an attorney, they might . . . be willing to speak to a mental health professional." Pearl did not personally contact background witnesses, but he "gave their names, [and] other data . . . to Dr. Krop and asked him to make the inquiries." Pearl, however, did help Krop obtain information from Robinson about his background. For example, about one month prior to resentencing, Pearl wrote a letter to Robinson advising that he was "in the process of final preparation" and asking Robinson to provide names of any family members in Georgia. Robinson replied by letter, naming certain individuals. Robinson also wrote, "I wish I could give you more to work with, but the majority of people I have known and/or been close to are now deceased." Pearl forwarded Robinson's reply to Krop and attached a note, which read as follows:

> Dear Harry: Just received this letter from Johnny Robinson. It may contain sources of information/background previously untapped. Sincerely, Howard.[17]

Pearl could not specifically recall whether he forwarded to Krop other names that Robinson gave Pearl during a prison visit. However, Pearl testified that it "would have been my practice unfailable [sic] to have done so. I can't imagine not having done so."

---

[17]The persons named in Robinson's letter were later contacted by Krop, except for Robinson's cousins. Robinson had written that he had "no idea where to contact" those cousins.

Pearl also indicated that he communicated with Krop "several times" and sent him everything he learned about Robinson. Krop reported to Pearl that "he had some difficulty . . . reaching family members and . . . receiving from them the kind of cooperation and cooperative spirit that I am sure he wanted to get . . . , but he [Krop] did talk to family members." Pearl noted that "Krop is just as competent in finding people and tracking them down as I am, so I left it to him." When asked whether he would have helped Krop get in touch with certain people, Pearl replied, in part, that he would have "done anything that [Krop] asked him to do, if he . . . asked me to find a particular person in a particular city, I would have done what I could to find that person, but I don't remember Dr. Krop asked me to do that." According to Pearl, Krop never told Pearl either (1) that he did not have sufficient information to render a diagnosis of Robinson, or (2) that he could not find witnesses and thus needed additional assistance from Pearl.

Pearl further testified that, in general, it was difficult to obtain information from Robinson. Pearl recalled that Robinson "was reluctant to give information or to identify the people from his family or from his past that we might have considered calling." According to Pearl, Robinson told him he did not want "them" to testify. Pearl agreed that, after his initial death sentence, Robinson was a "friendly, truthful, and cooperative client," but Robinson "certainly didn't want to

29

get members of his family involved and didn't talk about that." Pearl later clarified that Robinson was "highly reluctant" and "non-communicative," and that therefore Pearl did not have access to the additional witnesses that Robinson's state 3.850 counsel "have found over a period of five years."

Many of those additional witnesses relayed Robinson's poverty. That poverty came as no surprise to Pearl because he knew about it "beforehand." In Pearl's opinion, evidence of poverty would not have had a substantial impact on a St. Augustine jury, in part, because St. John's County was not a rich county, and thus Robinson's poor, rural background would not be meaningful to people who had similar backgrounds.[18] As to the stream of migrant labor in the East, Pearl did not consider "the question of whether – the fact that [Robinson] was a member of the migrant stream." Pearl knew, however, that Robinson worked around migrant laborers, as well as the "environment in which [Robinson] lived." But Pearl did not believe that information "would have been productive if exhibited to a St. John's County jury in terms of capturing there [sic] sympathy or interest."

Pearl also testified about his choice to use Krop as the mitigation witness. Pearl had used Krop as a mitigation witness in other capital cases. Pearl explained

---

[18]Pearl indicated (1) that juries are different throughout Florida and (2) that having tried all of his capital cases in the Seventh Judicial Circuit, he understood juries in St. Augustine, Florida.

that "[w]ith Dr. Krop's investigation, interviews, tests, his ability to receive information from anyone and include[ ] it in his testimony as history, even though it is mere hearsay," he "eliminates the risk of loose canons . . . . if I use mothers, relatives, friends, I always run the risk that such people are not controllable and that their testimony may run away from me because they have their own agenda, rather than attend to the things I want them to say." However, with Krop, Pearl could "bring in all the testimony as history without the risk of outbursts . . . [or] uninvited ejaculations which might risk the defendant in the eyes of the jury."

In this case, Pearl stated that he "looked at other witnesses to see whether I might want to [put people on other than Krop]," and Pearl decided not to. Pearl explained that he "decided there was nothing — no other people who could testify that Dr. Krop could not include in his testimony that would not put the defendant at additional risk on cross-examination by a competent prosecutor . . . ." And when deciding whether to present a witness in mitigation, Pearl generally considered "whether or not . . . that [witness] . . . would constitute a deployment of evidence that could be used on cross examination to destroy the character of the defendant or to compromise the meaning or intent of the evidence."

In light of Robinson's criminal history, Pearl testified that there would be danger in presenting a witness who had not seen Robinson in some time. Pearl

31

stated that "[i]t would be catastrophic" because the prosecutor could "have confronted these witnesses with Mr. Robinson's later criminal activity . . . [a]nd then ask[ed] them whether or not that might change their minds about their opinion of Mr. Robinson's good character." Pearl acknowledged that the resentencing jury was going to hear about portions of Robinson's criminal background anyway, but at least with Krop "it would come from a neutral source . . . . Other witnesses would have appear[ed] . . . more inclined toward his side . . . less impersonal. And the cross examination would have hammered and repeated facts about his prior criminal record . . . [which] would have been driven into the minds of the jury much more repeatedly . . . ."

Moreover, Pearl was successful in defeating the introduction of certain "similar fact" evidence at resentencing. One week after St. George's murder, Robinson was arrested for an armed robbery and sexual assault of another woman stranded on the interstate. Thus, the resentencing jury never heard, as the State put it during the 3.850 hearing, "that [Robinson] had used a similar, MO, if you will, of driving along the interstate, quote, 'Helping a disabled vehicle, committing an armed robbery and a sexual assault.'"[19]

---

[19]The following exchange occurred:
STATE:     [The jury never heard] that he was arrested [for this] . . . ?
PEARL:     No, they did not.
STATE:     And, certainly they never heard the testimony of the officer who

Pearl acknowledged that lack of corroboration of Krop's testimony was a point attacked by the State during Robinson's initial sentencing. However, Pearl "felt that further character evidence about Mr. Robinson [at the resentencing] would be harmful not helpful."

**B.    3.850 Testimony of Krop**

Krop testified that, upon appointment, he did not understand he was responsible for investigating Robinson's background. According to Krop, Pearl did not tell him he was expected to talk with Robinson's friends, family members, or former employers. Krop did not bill any time for looking for mitigation witnesses. Despite this testimony, Krop agreed that, prior to resentencing, he received Pearl's note advising him "of information/background previously untapped," to which Robinson's letter naming certain individuals was attached. Krop also admitted that on the night before resentencing, Pearl told Krop to contact three individuals from Robinson's background, and Krop did so. Krop added, however, that Pearl did not ask him to contact any other individuals.

---

|        | made the case? . . . |
|--------|----------------------|
| PEARL: | No, they did not. |
| STATE: | And they did not hear the testimony of the eye witness who said Johnny Robinson did it? |
| PEARL: | No, they did not. |
| STATE: | That is because nothing that was presented in mitigation opened the door for that testimony, true? |
| PEARL: | Certainly. |

Krop's testimony during resentencing was that Robinson was "reluctant" to have family members contacted, did not want them involved, and did not feel they were relevant. However, Krop's testimony during the 3.850 hearing was that Robinson was cooperative, never refusing to give information when asked. But Krop agreed that Robinson indicated to Krop it would be difficult to contact people from his past because Robinson did not know where they could be found.

As noted above, Pearl testified that Krop never indicated that he had insufficient information to diagnosis Robinson. During the 3.850 hearing, Krop did not contradict that portion of Pearl's testimony. Nonetheless, based on one more interview with Robinson and a review of additional documents provided by Robinson's 3.850 counsel, Krop retreated from his initial diagnosis of Robinson.[20]

As to his initial diagnosis that Robinson had an "antisocial personality disorder," Krop testified that he had to "question" that diagnosis because he no longer believed certain criteria applied to Robinson. For example, one 3.850 affidavit suggested that Robinson did not go to school because he was teased for being "the poorest of the poor." Krop testified that the truancy criterion for antisocial personality disorder is not applicable "if in fact there is a legitimate

_____

[20]Those additional documents included (1) excerpts from books about migrant farm workers, (2) certain of Robinson's medical and inmate records, and (3) several affidavits about Robinson's background.

34

reason [for truancy] other than the individual is just not wanting to go to school."

Krop indicated his "new diagnosis" for Robinson would be "personality disorder not otherwise specified" or "mixed personality disorder." Even with this additional information, Krop could not rule out his initial diagnosis of "antisocial personality disorder." Krop stated only that he did not "have sufficient information at this point in time to truly say this person [Robinson] had an antisocial personality disorder."

As to his initial diagnosis of "psychosexual disorder," Krop testified that he was probably mistaken to characterize that as a "diagnosis," even without considering the additional information he had reviewed, as follows:

> Well, I guess I was never asked and perhaps I misspoke. Psychosexual disorder is really not a diagnosis . . . . [I]t is a generic description for an individual that suffers from either a paraphelia or a sexual dysfunction. Those are two types of diagnostic entities . . . .[21]

Krop then indicated that certain references by Pearl to the resentencing jury about Robinson's sexual tendencies described "a paraphelia," which, based on his post-conviction review, Krop did not believe Robinson had.

---

[21]Krop further testified (1) "I did make reference to [psychosexual disorder] as a diagnosis, which was not correct," and (2) "I should have said it is a disorder. It is not considered a diagnosis. In other words, it is a generic term which then underneath it would be a diagnosis."

In large part, Krop based his retreat from a diagnosis of "psychosexual"

disorder" on the affidavits of three women filed by Robinson's counsel in the

3.850 proceedings.  The women's affidavits indicated they had significant romantic

relationships with Robinson.  Those women are: (1) Cora Mae Evans, with whom

Robinson had a child in 1979[22]; (2) Winifred Lovett, with whom Robinson once

lived; and (3) Brenda Ann Shivers, with whom Robinson also once lived.

According to Krop, these woman described Robinson as "kind," "affectionate,"

"respectful to women," and reported that Robinson showed "no deviant sexual

behavior."  Because these affidavits indicated Robinson "is capable of forming and

having relationships with women of a nonviolent nature and, to the contrary, even

a kind and respectful relationship . . . sensitive to a woman's needs," Krop would

not consider Robinson as having a psychosexual disorder.

Krop also indicated that alcohol abuse might be a proper, additional

diagnosis for Robinson.  Krop reviewed certain affidavits indicating that

Robinson's grandmother Janie, who raised him, was a big drinker, and that

Robinson started drinking in his youth.  One affidavit also described "drunken

binges" by Robinson, although it was not clear when those binges occurred.  And

_____

[22]Cora Mae Evans testified that Robinson "treated me as special because I was a woman .
. . . He was very respectful of me . . . . He has never tried to hurt me . . . . He is truly a caring
man."

36

in another affidavit, an employer of Robinson stated that he heard Robinson could "tie one on," but "never once seen [Robinson] take a drink." Based on these affidavits and other post-conviction materials indicating the prevalence of drinking in migrant camps generally, Krop testified that Robinson may have had an alcohol abuse problem. However, Krop "cannot definitively diagnose [Robinson] as alcohol abuse at this time or alcohol dependent." Krop agreed that, even now, he does not diagnose Robinson as having a substance abuse disorder.

Krop also indicated that he would have modified other aspects of his resentencing testimony. For instance, Krop no longer believed he had given a fair summary of Robinson's life of antisocial behavior, given that several 3.850 affidavits described Robinson as kind, generous, and respectful. Krop also did not believe his own testimony that Robinson had no formal employment was accurate.[23] And Krop now believed that Robinson's contact with labor camps was more extensive than he had once thought.[24]

---

[23]This inaccuracy is not due to lack of information at the time of resentencing. Krop admitted that, prior to resentencing, Robinson told Krop he had worked for a newspaper in Georgia for three years. And Robinson's PSI (reviewed by Krop before resentencing) indicated a history of employment.

[24]Summarizing how he would now testify about Robinson's background, Krop stated:
> I would discuss the migrant life, how his abusive environment and his involvement in migrant lifestyle and the drinking and the sexual abuse, putting all that together. I would say it's much more severe than I ever imagined . . . and I would talk about how all of those factors have a dynamic impact on his personality and have

37

## C.	Additional Mitigation Witnesses

Robinson's 3.850 counsel located several people from Robinson's background who would have testified during resentencing, but most of them had not seen Robinson for some time. The 3.850 court heard testimony from two of them, Ethel Byrd and Warner Byrd. Robinson proffered affidavits from the other potential mitigation witnesses.

Ethel Byrd knew Robinson well as a boy, yet had not seen him since Robinson was about 20 years old. Ethel's testimony focused on the physical abuse Robinson suffered while growing up. Ethel witnessed Robinson's grandfather, known as Baby Boy, beat Robinson with "belts, electric cords, or whatever," at the early age of 5. Baby Boy was a farm labor contractor who had Robinson working in the fields, under horrible conditions, by around 5 or 6 years old. If Robinson stopped picking crops, then "he got a beating." Ethel testified that Robinson's grandmother, Janie, drank whisky "quite often," and that she had "occasionally" seen Janie intoxicated. According to Ethel, Baby Boy and Janie treated their natural son, Troy Hester, considerably better than Robinson. Unlike Troy, Robinson did not have new clothes or shoes.

---

contributed in a significant way to his behavior on the date of the offense.

38

Warner Byrd, Ethel's son, grew up with Robinson. Much of Warner's testimony comported with Ethel's concerning Robinson's work in the fields, the conditions in those fields, and the generally poor childhood Robinson had. Warner testified about the school which he and Robinson attended. That school had no recreational facilities, and Robinson was required to cut the wood for the school's fire each morning. To keep warm in the winter, "you wore a lot of clothes," because even with a fire, the school did not stay warm. Warner remembered Janie's drinking and had seen Baby Boy beat Robinson to the point that he drew blood.

Robinson's 3.850 counsel also filed affidavits from potential mitigation witnesses. Generally, the affidavits attested to Robinson's good deeds for others,[25] kindness towards friends and family,[26] history of hard work,[27] and good behavior in

---

[25]For example, one of Robinson's former employers, William Maddox, testified that Robinson "liked helping folks." According to Maddox, when Robinson saw "somebody broke down along the road[,] . . . being a mechanic, he would stop and see what the trouble was." Robinson also helped to quell disputes at the work place in a "kind and gentle" way.

[26]For example, Troy Hester testified about a time that Robinson helped him when Troy had been shot in the chest and was "in the special care ward for 72 days." That "whole time," Robinson stayed with Troy's family and "took care of everything." Robinson ran Troy's business, looked after Troy's family, sat with Troy in the hospital, and "drove down to Virginia and got Baby Boy and some [others] and drove them up to visit me in the hospital." According to Troy, Robinson "is the kind of person you can ask absolutely anything of."

[27]For example, several members of the Smith family, who owned the newspaper for which Robinson worked, testified that Robinson was a great worker. Similarly, Maddox claimed that Robinson was the best worker he ever had. Ray Hutcheson also knew Robinson's past employment history, and recalled that Robinson had fixed some of his trucks and "was a real

39

prison,[28] as well as to the difficulties of life in the migrant farm system.[29]  Certain

affidavits recounted the physical abuse suffered by Robinson and other difficult

aspects of his childhood.[30]  The affidavit of Winifred Lovett indicated that she had

visited Robinson "over at the adult jail," but Lovett did not state in her affidavit

how old she believed Robinson was at that time.[31]

Lovett, as well as others, also testified about the role alcohol generally

---

good mechanic."  Hutcheson also testified that Robinson "did work for the police department putting tires on police cars" and "for some other friends" of Hutcheson's.  Hutcheson remembered Robinson as "friendly," "good natured," "real humble," and as someone who got along well with everyone.

[28]For example, William Gossard, a state prison official in Maryland, testified that Robinson was "handpicked" from a large number of inmates to help open another facility because "he had a good record, was trustworthy, and had less than two years to serve on his sentence."  Robinson was "a model inmate," with whom Gossard had no problems.  Robinson showed respect to other prison officials.

[29]Maddox, a crew leader for migrant farm workers in Florida, began putting labor crews together in the early 1960s, which is "about the same time [Robinson] was traveling around doing farm work as a youngster."  According to Maddox, labor camps are "just plain rough." Maddox also testified: "I know [Robinson] carried scars from them days, because he used to talk about it sometimes."  See also Affidavit of Albert Lee (former migrant worker and investigator for the South Florida Migrant Legal Services Program).

[30]See Affidavit of Troy Hester.  Other examples include Ernest Smith, a former classmate, and Aaron Kant, a former teacher.  Smith testified about Robinson's work in the fields and hand-me-down clothes.  Kant described Robinson as the "poorest of the poor."

[31]Lovett's affidavit stated only (1) that she met Robinson when she was 12 or 13 years old, (2) that she and Robinson "were very close to the same age," and (3) that Robinson had been arrested (and allegedly sent to an "adult" prison) after they had been "seeing each other for about six or eight months."

40

played in Robinson's life, particularly when he was growing up. For example, Lovett and Robinson used to drink beer together growing up, and several affidavits indicated that Robinson's grandmother Janie was a big drinker. Jack Humphrey, a labor contractor who knew Robinson growing up in the early 1960s, testified that "[o]n the weekends, all the young one's [in the labor camp], including [Robinson], would drink beer and wine." Baby Boy Hester[32] described Robinson as a binge drinker, but his affidavit does not indicate when he had last seen Robinson, or at what point in Robinson's life he had seen these binges. William Maddox, Robinson's employer in the years before St. George's murder, heard that Robinson drank, but admitted that he had never once seen Robinson drink. None of the affidavits procured by Robinson's 3.850 counsel specifically address the amount of alcohol Robinson reported drinking before he murdered St. George.

## D.    State Courts Deny 3.850 Relief

After the three-day hearing, the court entered an order denying Robinson's 3.850 motion. The 3.850 court determined that "[e]ven if the affidavits are all true the aggravating circumstances overwhelm the mitigating circumstances." Applying Strickland v. Washington, 466 U.S. 668 (1984), the court concluded that

---

[32]Baby Boy Hester was born to Robinson's grandfather, also known as Baby Boy, after Robinson left Grandfather Baby Boy's house.

Robinson's trial counsel exercised reasonable professional judgment and that, in any event, there was "not a reasonable probability that Defendant would have received a life sentence if the background evidence would have been presented in the manner [3.850 counsel] argue it should have been."

Under Strickland's prejudice prong, the 3.850 court noted that Pearl's decision not to present character witnesses who would testify that Robinson was a good, non-violent person "effectively kept out evidence of a very similar, very violent sexual assault which [Robinson] committed" subsequent to St. George's murder. The 3.850 court determined that had "this evidence come in, there would be no chance the jury would have recommended life." The 3.850 court also noted that much of the new mitigation evidence was cumulative of what had been presented to the resentencing jury and cumulative of those nonstatutory mitigating factors found by the state trial court.[33]

The Florida Supreme Court affirmed the denial of Robinson's 3.850 motion and subsequent request for rehearing. Robinson III, 707 So.2d at 688. The Florida

---

[33]The 3.850 court rejected Robinson's arguments that Pearl's failure to investigate mitigation evidence (1) led to the presentation of inaccurate arguments to the resentencing jury, and (2) led to Krop being unable to perform a competent mental health examination. The 3.850 court found that Pearl accurately represented to the jury that Robinson had spent most of his adult life in prison and that other alleged inaccuracies were the result of Robinson's not having provided information to Pearl. In any event, the 3.850 court found no prejudice, even if Robinson's allegations were true. As to the competency of Krop's exam, the 3.850 court found that Krop's later change in diagnosis was "minor at best."

42

Supreme Court concluded that, "although counsel's performance may have been deficient in some respects, Robinson cannot demonstrate that he was so prejudiced as to merit a new penalty phase proceeding." Id. at 695. That court pointed out that, "despite the new information provided by postconviction counsel, Krop still believes that Robinson has some type of personality disorder and still has some type of sexual disorder." Id. at 697. It also reasoned that much of the new mitigation evidence was cumulative. As for the noncumulative evidence about Robinson's loving relationships with women and other character evidence, the Florida Supreme Court concluded this would have opened the door to "evidence that less than one week after the St. George murder, Robinson allegedly committed an armed robbery and rape with Fields after coming upon a woman with a disabled car on the interstate." Id. at 696. It emphasized that these "alleged crimes were an almost exact replay of what happened with Ms. St. George, minus the murder." Id.

For these reasons, the Florida Supreme Court determined that no reasonable probability existed that the mitigating evidence subsequently gathered and presented to the 3.850 court would have altered the balance of aggravating and mitigating factors in this case. Thus, the Florida Supreme Court affirmed the 3.850 court's determination that no prejudice resulted from Pearl's representation,

43

concluding as follows: "Considering the five valid aggravators, the cumulative nature of the proffered lay testimony, and the modification of Krop's testimony, we find no error in the trial court's finding that Robinson has not demonstrated the prejudice necessary to mandate relief." Id. at 697.

Although deciding this case on the prejudice prong of Strickland, the Florida Supreme Court did comment on Pearl's performance. It opined that "Pearl should have been more proactive and more directly involved" with Krop's investigation and, "[i]n that sense, his performance was probably deficient." Id. In large part, however, the Florida Supreme Court indicated that Pearl had performed effectively. It noted that Krop's decision to rely solely on Krop's testimony, while "questionable," was "defensible." Id. And, pointing to the subsequent armed robbery and rape, the Florida Supreme Court stated that "[t]he trial court could have concluded that Pearl was not ineffective in not opening the door to this potentially devastating rebuttal evidence." Id.

## V. FEDERAL HABEAS PROCEEDINGS

On April 30, 1999, Robinson filed a petition for a writ of habeas corpus in federal court under 28 U.S.C. § 2254, reasserting that Pearl was ineffective during

resentencing.[34]  In denying relief, the district court concluded that the Florida

courts' application of <u>Strickland</u> was neither contrary to, nor involved an

unreasonable application of, clearly established federal law as determined by the

United States Supreme Court.  Robinson timely appealed the denial of his § 2254

petition.  This Court granted a certificate of appealability ("COA") as to whether

Robinson received ineffective assistance of counsel during his resentencing.[35]

## VI. STANDARD OF REVIEW

"In appeals involving claims of ineffective assistance of counsel, we

traditionally review the district court's findings of fact for clear error and its legal

conclusions and mixed questions of law and fact <u>de novo</u>."  <u>Fugate v. Head</u>, 261

F.3d 1206, 1215 (citing <u>Williams v. Head</u>, 185 F.3d 1223, 1226-27 (11th Cir.

1999)), <u>cert. denied</u>, 122 S. Ct. 2310 (2002). In this case, however, both this Court

and the district court are reviewing, pursuant to 28 U.S.C. § 2254, a final state

judgment on Robinson's claim.  Section 2254, as amended by the Anti-Terrorism

---

[34]Robinson has not raised any issue concerning the constitutionality of Florida's capital sentencing scheme in his original § 2254 petition (filed on April 30, 1999), in his amended § 2254 petition (filed on January 2, 2001), or in his request for a certificate of appealability in this Court (filed on October 29, 2001).  Thus, we do not discuss <u>Ring v. Arizona</u>, 122 S. Ct. 2428 (2002).

[35]We do not consider Robinson's argument that his trial counsel had an undisclosed conflict of interest.  That separate claim for relief, denied by the state courts and the district court, is outside the scope of Robinson's COA.  <u>See</u> <u>Murray v. United States</u>, 145 F.3d 1249, 1251 (11th Cir. 1998) ("[I]n an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the COA.").

and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, establishes a highly deferential standard for reviewing state court judgments. See 28 U.S.C. § 2254; Williams v. Taylor, 529 U.S. 362, 402-03 (2000).[36]

First, § 2254(e)(1) provides for a highly deferential standard of review for factual determinations made by a state court: "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Fugate, 261 F.3d at 1215; Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000), cert. denied, 122 S. Ct. 357 (2001).

Second, § 2254(d) allows federal habeas relief for a claim adjudicated on the merits in state court only where that adjudication in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

---

[36]Because Robinson's petition was filed in April 1999, our review, like the district court's, is governed by AEDPA, which was effective as of April 24, 1996.

"Section 2254(d)(1) 'places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court' by requiring satisfaction of one of two conditions for issuance of the writ." Fugate, 261 F.3d at 1215-16 (quoting Williams, 529 U.S. at 412). As the Supreme Court recently put it, AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 122 S. Ct. 1843, 1849 (2002) (citing Williams, 529 U.S. at 403-04).

## VII. DISCUSSION

Because AEDPA governs this appeal, we first review the controlling legal principles under Strickland v. Washington, 466 U.S. 668 (1984), and whether the Florida Supreme Court identified and applied those principles. We then explain why the Florida Supreme Court's ruling on the prejudice prong of Strickland was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.[37]

---

[37]The Florida Supreme Court did not decide the performance prong of Strickland. Thus, we stress that nothing in this opinion should be read as concluding or implying that Robinson's trial counsel during resentencing was ineffective in any way. The Florida Supreme Court's approach, disposing of Robinson's claim under the prejudice prong and not resolving the performance prong, is itself consistent with United States Supreme Court precedent. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground

47

## A.    Governing Legal Principles

It is well established that the Supreme Court's decision in Strickland is the "controlling legal authority" to be applied to ineffective assistance of counsel claims.  Williams, 529 U.S. at 406; Fugate, 261 F.3d at 1216.  To prevail on a claim of ineffective assistance, a petitioner "must show both incompetence and prejudice."  Chandler v. United States, 218 F.3d 1305, 1312 (11th Cir. 2000) (en banc), cert. denied, 531 U.S. 1204 (2001).  "In a capital case, the two-prong Strickland analysis is applied at both the guilt and penalty phase."  Fugate, 261 F.3d at 1216 (citing Mincey v. Head, 206 F.3d 1106, 1142 (11th Cir. 2000)); Chandler v. Moore, 240 F.3d 907, 917 (11th Cir. 2001) ("This two-pronged test is also applied to the sentencing phase because the capital sentencing proceeding is similar to a trial in its adversarial format and counsel's role is similar.").[38]

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is . . . high."  Van Poyck v. Fla. Dep't. of Corrs.,

_____

of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001) ("In this case, we need not decide whether counsel's performance was in fact deficient because Grayson so clearly fails to satisfy the prejudice prong of the Sixth Amendment analysis."), cert. denied, 122 S. Ct. 2674 (2002).

[38]See Cone, 122 S. Ct. at 1851-52 (stating that "[t]he aspects of counsel's performance challenged [in this capital case, including] . . . the failure to adduce mitigating evidence . . . are plainly of the same ilk as other specific attorney errors we have held subject to Strickland's performance and prejudice components," and citing as examples Darden v. Wainwright, 477 U.S. 168 (1986), and Burger v. Kemp, 483 U.S. 776 (1987)).

290 F.3d 1318, 1322 (11th Cir. 2002). Indeed, "[u]nder the prejudice prong of Strickland, '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Grayson v. Thompson, 257 F.3d 1194 ,1225 (11th Cir. 2001) (quoting Strickland, 466 U.S. at 693), cert. denied, 122 S. Ct. 2674 (2002). Instead, the petitioner "must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Chandler v. United States, 218 F.3d at 1312-13 (quoting Darden v. Wainwright, 477 U.S. 168 (1986)); see Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir.1998) ("Our analysis of the prejudice prong, however, must also take into account the aggravating circumstances associated with Dobbs's case, to determine whether 'without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different.'") (quoting Bolender v. Singletary, 16 F.3d 1547, 1556-57 (11th Cir. 1994)).[39]

## B.    Florida Supreme Court's Rulings

### 1.    "Contrary to"

---

[39]See also Clisby v. Alabama, 26 F.3d 1054, 1056 (11th Cir. 1994) ("Petitioners alleging ineffective assistance in death penalty cases bear the burden of showing prejudice: 'the question is whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'") (quoting Strickland, 466 U.S. at 695).

We first conclude that the Florida Supreme Court's decision in this case was not "contrary to" clearly established federal law as determined by the United States Supreme Court. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent." Fugate, 261 F.3d at 1216 (quoting Williams, 529 U.S. at 405). "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." Id. (citing and quoting Williams, 529 U.S. at 405-06).

Here, the Florida Supreme Court correctly identified the principles set forth in Strickland as those governing the analysis of Robinson's claim of ineffectiveness during resentencing. See Robinson III, 707 So.2d at 695 ("To merit relief, Robinson must show not only deficient performance, but also that the

50

deficient performance so prejudiced his defense that, without the alleged errors, there is a 'reasonable probability that the balance of aggravating and mitigating circumstances would have been different.'") (quoting Bolender, 16 F.3d at 1556-57).  And Robinson does not cite to, nor are we aware of, any decision in which the United States Supreme Court, faced with materially indistinguishable facts, reached a decision different from that reached by the Florida Supreme Court in this case.[40]

## 2.     *"Unreasonable Application"*

We next conclude that the Florida Supreme Court's decision did not involve an "unreasonable application" of clearly established federal law as determined by the United States Supreme Court.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct

_____

[40]The only United States Supreme Court decisions that inform this conclusion are those existing at the time the Florida Supreme Court decided this case.  However, we note that even since then there is no decision in which the United States Supreme Court, when faced with materially indistinguishable facts, reached a decision different from that reached by the Florida Supreme Court in this case.  See Breedlove v. Moore, 279 F.3d 952, 962-63 (11th Cir. 2002) (reviewing under AEDPA a 1991 decision of the Florida Supreme Court and concluding that the Florida Supreme Court "easily" satisfied the "contrary to" clause of § 2254(d)(1) because it "correctly identified . . . the governing legal principle[s]," and there was no "pre-1991 case in which the Supreme Court arrived at a conclusion different from that of the Florida Supreme Court when faced with materially indistinguishable facts"); Bottoson, 234 F.3d at 533 ("The state court . . . applied the correct 'reasonable probability' standard with respect to the prejudice prong, and the facts . . . are not materially indistinguishable from a decision of the Supreme Court concluding that the 'reasonable probability' standard had been satisfied; thus, the state court adjudication in this case is not 'contrary to' Strickland.").

51

governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13. In Williams, "[t]he Supreme Court clarified that, under 28 U.S.C. § 2254(d)(1), the federal court may not issue the writ unless it finds that the state court applied Supreme Court law unreasonably." Fugate, 261 F.3d at 1216 (citing Williams, 529 U.S. at 411).

In deciding this issue, "the federal court should consider whether the state court's application of the law was objectively unreasonable and should not apply the subjective all reasonable jurists standard." Id. (citing Williams, 529 U.S. at 410) (internal quotation marks omitted). Recently, the Supreme Court adhered to its pronouncements in Williams, stating that "we stressed in Williams that an unreasonable application is different from an incorrect one." Cone, 122 S. Ct. at 1850. The Supreme Court further noted that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Id. (quoting Williams, 529 U.S. at 411).[41]

---

[41]See Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide.")

Here, for several reasons, the Florida Supreme Court's application of Strickland's prejudice prong to Robinson's claim of ineffectiveness during resentencing was not objectively unreasonable. More specifically, its decision — that Robinson was not prejudiced by his trial counsel's alleged failure to investigate mitigation — was not objectively unreasonable.[42]

First, none of the mitigation evidence presented in the 3.850 proceedings changes the fact that no statutory mitigating circumstances exist in this case.[43] Nothing in the mitigation evidence suggests that Robinson has an "extreme mental or emotional disturbance." Indeed, Krop has never retreated from his testimony

---

[42]As noted, the 3.850 court determined that, even if all the proffered affidavits were true, the aggravating circumstances in Robinson's case overwhelm the mitigating circumstances. Affirming the 3.850 court, the Florida Supreme Court also considered "the proffered lay testimony." Thus, in concluding that the Florida Supreme Court's decision was not objectively unreasonable, we treat as new mitigation evidence not only the witness testimony at the 3.850 hearing, but also the proffered affidavits of potential mitigation witnesses.

[43]At the time of Robinson's resentencing, the statutory mitigating circumstances under Florida law were as follows: (1) "[t]he defendant has no significant history of prior criminal activity," (2) "[t]he capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance," (3) "[t]he victim was a participant in the defendant's conduct or consented to the act," (4) "[t]he defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor," (5) "[t]he defendant acted under extreme duress or under the substantial domination of another person," (6) "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," and (7) "[t]he age of the defendant at the time of the crime." Fla. Stat. Ann. § 921.141 (6)(a)-(g) (1989).
We do not further discuss two of these circumstances: (1) lack of a significant history of prior criminal activity; and (2) age of the defendant. Robinson qualified for neither of these circumstances, and no new mitigation evidence in the 3.850 proceedings could have changed that.

53

before the resentencing jury that Robinson has no such disturbance. Robinson's counsel also offered nothing in the 3.850 court suggesting that St. George consented to the kidnapping, robbery, rape, or murder, or that St. George was otherwise "a participant" in Robinson's conduct, except of course as a victim. Nothing suggests that Robinson's ability to "appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Nor does anything offered in the 3.850 court indicate (1) Robinson was only an "accomplice" in the kidnapping, robbery, rape, and murder of St. George and that Robinson's role in those offenses were "relatively minor," or (2) that Robinson "acted under extreme duress or under the substantial domination of another person." Indeed, the resentencing evidence indicating that Robinson was the "key player" in the offenses remains unchanged. In short, even if Robinson's trial counsel had uncovered and presented the mitigation evidence that Robinson contends he should have, neither the resentencing jury nor the trial judge would have had any ground upon which to find a single statutory mitigating circumstance in this case.[44]

---

[44]Robinson also contends that his trial counsel's alleged failure to investigate mitigation "led to the presentation of materially inaccurate and false information" before the resentencing jury. We reject this claim. First, Robinson did spend most of his adult life in prison and thus that statement by his trial counsel was neither inaccurate nor false. Second, any modifications in Krop's testimony were minor at best. Additionally, the 3.850 court specifically found that the alleged inaccuracies were the result of Robinson's not having provided information to Pearl, a

54

Second, the new mitigation evidence also leaves unaltered the five valid statutory aggravating circumstances surrounding Robinson's offenses, all of which were presented to the resentencing jury and found by the trial court. Robinson was on parole for a prior rape conviction at the time of the offenses in this case. That prior rape conviction remains a "violent felony." Nothing pointed to in the 3.850 proceedings changes the fact that Robinson committed this murder in the course of both a kidnapping and sexual battery, or that Robinson murdered St. George to avoid arrest for that kidnapping and sexual battery. And nothing presented by way of mitigation alters, or casts doubt upon, the evidence that Robinson committed this murder in a cold, calculated, and premeditated manner. The new mitigation evidence casts no doubt upon, much less disproves, any of the five valid statutory aggravating circumstances presented to the resentencing jury and found by the trial judge. See Grayson, 257 F.3d at 1226 (concluding that petitioner failed to satisfy the prejudice prong of Strickland, in part, because "none of the [mitigation] evidence developed in connection with the state habeas proceedings served to alter in any way the aggravating circumstance[s] . . . that supported the imposition of the death penalty in this case").

---

factual finding which Robinson has not rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.")

Third, most of the new mitigation evidence is cumulative of the nonstatutory mitigating circumstances presented during resentencing.[45] The resentencing jury and trial judge heard, <u>inter alia</u>, (1) that Robinson was both physically and sexually abused as a child, (2) that he worked in migrant labor camps, (3) that his childhood was generally difficult, (4) that he did not know his natural mother, (5) that he behaved well in prison, and (6) that he had done certain good deeds. While the additional mitigation witnesses procured by Robinson's 3.850 counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge. By way of example, Troy Hester testified in the 3.850 court proceedings that Robinson had done good deeds for him in that Robinson took care of Troy's family and business while Troy was in the hospital. Although the resentencing jury and trial judge did

_____

[45]<u>See</u> <u>Grayson</u>, 257 F.3d at 1228; <u>Glock v. Moore</u>, 195 F.3d 625, 636 (11th Cir. 1999) (concluding that the petitioner could not show prejudice because "much of the new evidence that [petitioner] presents is merely repetitive and cumulative to that which was presented at trial"); <u>Devier v. Zant</u>, 3 F.3d 1445, 1452 (11th Cir. 1993) (concluding that failure to call other available witnesses during penalty phase was not ineffective because "[t]hese additional witnesses would have testified to essentially the same impressions and sentiments about [the petitioner] that his close relatives had already related at trial and would have added little to the weight of the mitigating evidence"); <u>see</u> <u>also</u> <u>Mulligan v. Kemp</u>, 771 F.2d 1436, 1444 n.6 (11th Cir. 1985) ("Petitioner submitted a list of twenty-five witnesses in his state habeas corpus proceeding, most of whom [counsel] had never contacted. . . . [But] it is not clear that the presentation of any of these uncontacted witnesses would have added anything but cumulative testimony to the case in mitigation that had already been prepared . . . .").

not hear that specific "good deed" evidence, they did hear evidence of other good deeds by Robinson, namely Robinson tutoring others in prison.[46]

We also note that some potential mitigation witnesses might have harmed Robinson's case. For instance, during the 3.850 proceedings, Warner Byrd's direct testimony did present a more detailed picture of Robinson's poverty and poor living conditions as a child. On cross-examination, however, Warner agreed that his situation growing up was essentially as bad as Robinson's, and yet neither he nor his siblings had ever been convicted of murder or sexual battery. The State probably would have similarly examined Warner had he testified during resentencing. And this reminder to the resentencing jury would have reinforced the notion that it was not necessarily Robinson's background that led to these criminal acts, a point not helpful to Robinson's case for a life sentence.

We recognize that the resentencing jury and trial judge heard the evidence of mitigation through only Krop. However, Krop testified during resentencing that some of Robinson's self-reported history had been corroborated by persons with

---

[46]Also, the additional mitigation evidence in the 3.850 court concerning Robinson's good behavior in prison, in addition to being cumulative, was specifically rejected by the trial judge as a factor not properly considered in mitigation. Thus, that additional evidence might have been no help at all, at least in the eyes of the trial judge who ultimately sentenced Robinson.

whom Krop spoke, thereby adding credibility to Robinson's reports.[47]  For example, Coreen and Earl Smith corroborated certain physical abuse, and Robinson's biological father corroborated Robinson's lack of contact with his natural mother.  A probation officer with whom Krop spoke, as well as Krop's review of Robinson's prison records, also corroborated Robinson's report that he functions well in prison.  Indeed, despite the fact that much of the mitigation evidence came only from Robinson's self-reports to Krop, the trial court specifically found in its sentencing order, as nonstatutory mitigating factors, that Robinson had a difficult childhood and suffered physical and sexual abuse during that childhood.

Moreover, even 3.850 counsel, with the benefit of time and hindsight, did not present to the 3.850 court any evidence tending to corroborate Robinson's stories of sexual abuse.  Thus, we cannot say that the resentencing jury was deprived of hearing corroborating evidence in that regard.

In any event, while the State questioned Krop about who had corroborated certain aspects of his testimony, the State did not allude to, much less argue, "lack of corroboration" during its closing arguments to the resentencing jury.  The State

_____

[47]Krop also indicated to the resentencing jury that, based on his training, he believed Robinson was probably telling the truth.

also did not comment on the weight or amount of nonstatutory mitigating evidence presented by the defense. Instead, the State focused on the aggravating circumstances in this case and argued that those factors warranted "the ultimate punishment and nothing less."[48] Additionally, as we discuss infra, calling additional character witnesses to corroborate Krop's testimony could have been particularly harmful to Robinson's case for life, as it may have opened the door to damaging information.

The mitigating evidence presented in the 3.850 proceedings also falls short of proving the two nonstatutory mitigating factors rejected by the trial judge as unsupported by Krop's testimony during resentencing: (1) intoxication at the time of the offenses, and (2) incarceration as a child in an adult prison.

The additional mitigation evidence is not probative of intoxication at the time of the offenses. Generally, that evidence deals only with Robinson having been raised around drinking and his drinking while a youth. No new witness saw Robinson on the day or night of the murder or indicated any knowledge of the

---

[48]See Van Poyck, 290 F.3d at 1325-26 (concluding that the Florida Supreme Court reasonably found that trial counsel's failure to present evidence the petitioner was not the triggerman during the penalty phase was not prejudicial, in part, because "being the triggerman played only a very minor role" in the prosecutor's closing argument, and stating "[e]specially because the prosecutor's main argument was that the death penalty was appropriate regardless of who the triggerman was, we see no reasonable probability that . . . the outcome of the sentencing phase would have been different").

amount of alcohol Robinson reported drinking prior to the murder. Indeed, the

majority of the mitigation witnesses had not seen Robinson for several years, much

less at any point close in time to St. George's murder. And Maddox, the man who

employed Robinson in the years before St. George's murder, testified only as to

what he had heard about Robinson's general drinking habits, and acknowledged

that he had "never once" seen Robinson take a drink. The 3.850 mitigation

evidence simply does not show what Robinson drank before committing murder.[49]

In any event, emphasizing intoxication at the time of St. George's murder, or

a history of drinking in general, could have damaged Robinson's case for life

before the resentencing jury. See Grayson, 257 F.3d at 1227 ("[W]e note that

emphasizing [the petitioner's] alcoholic youth and intoxication may also have been

damaging to [the petitioner] in the eyes of the jury."); Tompkins v. Moore, 193

F.3d 1327, 1338 (11th Cir. 1999) ("[A] showing of alcohol and drug abuse is a

two-edged sword which can harm a capital defendant as easily as it can help him at

sentencing.") (citing Waldrop v. Jones, 77 F.3d 1308, 1313 (11th Cir. 1996));

---

[49]See Hill v. Moore, 175 F.3d 915, 926 (11th Cir. 1999) ("The evidence [of mitigation] petitioner proffered . . . regarding his drug use the day of the murder is largely irrelevant. . . . Petitioner has not, and cannot, show that there was any measurable amount of cocaine in his blood. In the end, the only evidence he has proffered that would support his claim that he was intoxicated during the robbery is the statement of his accomplice that they had been using drugs that day. That evidence is insufficient to demonstrate a reasonable probability that, had counsel put that evidence before the jury, it would not have recommended, and the trial court would not have imposed, a death sentence.").

Clisby, 26 F.3d at 1056 ("Precedents show that many lawyers justifiably fear introducing evidence of alcohol and drug use."); Rogers v. Zant, 13 F.3d 384, 388 (11th Cir. 1994) (noting reasonableness of lawyer's fear that defendant's voluntary drug and alcohol use could be "perceived by the jury as aggravating instead of mitigating") (emphasis in original).[50]

Probative evidence in the 3.850 proceedings with regard to Robinson's allegedly having been incarcerated in an adult prison as a child is similarly lacking. Robinson's 3.850 counsel did proffer a police report dated at a time when Robinson would have been 14, and that police report lists Robinson's age as 19. At best, however, that police report corroborates Krop's testimony during resentencing that Robinson had lied about his age when he was arrested during his childhood. But that police report is not proof that Robinson actually was sent to an adult prison for that offense (or any other offense), much less that Robinson served any substantial time in an adult prison as a minor.[51]

[50]We also do not find Krop's testimony indicating that, based on his 3.850 review, he would consider an alcohol abuse diagnosis for Robinson changes the balance of factors in this case. First, even after considering all the evidence procured by 3.850 counsel and conducting another interview with Robinson, Krop could not diagnose Robinson as having an alcohol abuse disorder. Second, even if Krop had made this diagnosis, these precedents demonstrate that "mitigation" evidence pertaining to a possible alcohol abuse problem could have hurt Robinson's case for life.

[51]We also do not find probative Lovett's affidavit indicating that she visited Robinson at the "adult prison" because, among other things, that affidavit is unclear as to how old Robinson was at that time. In any event, evidence that Robinson was incarcerated in an adult prison as a

61

Fourth, much of the information presented in the 3.850 proceedings may have been harmful to Robinson's case and tipped the scales further in favor of the death penalty.[52] The new mitigation evidence that Robinson "had loving relationships with women" would have opened the door to evidence that was particularly damaging. Indeed, had Robinson's trial counsel presented this mitigation evidence, it would have allowed the State to present evidence that only five days after murdering and raping St. George, Robinson allegedly raped and robbed another woman, Jennifa Bashford, in similar circumstances.[53]

Discussing this subsequent robbery and rape, the Florida Supreme Court noted that "Jennifa Bashford and three others were robbed in the early morning hours" five days after St. George's murder, and after that robbery, "Ms. Bashford

_____

juvenile would not likely have affected the sentence in this case, particularly because, even in the 3.850 proceedings, there is zero evidence of what happened to Robinson in this adult prison, assuming he was ever sent to one. Indeed, during resentencing Krop testified only to his own belief that this could be damaging. Nothing Robinson points to in the 3.850 proceedings offers any additional evidence particularized to what Robinson's experiences were in this regard.

[52]See Grayson, 257 F.3d at 1227 (concluding that the evidence presented in the state habeas proceedings would not have altered the balance of aggravating and mitigating factors, in part, because some of that evidence "may have been harmful to [petitioner's] request for a life sentence").

[53]See Van Poyck, 290 F.3d at 1323 (concluding that the Florida Supreme Court was not unreasonable in finding lawyer effective when he did not present certain mitigation evidence in part because "[c]ounsel concluded that the use of such [evidence] would have opened the door to a considerable amount of damaging evidence" and "the harm from the jury learning of these other factors could have outweighed the benefits of the evidence Petitioner now says should have been presented").

was allegedly raped by Robinson." Robinson III, 707 So.2d at 697 n.11. Some of the articles stolen from the victims were later found in a search of Robinson's vehicle, but "the charges in that case against Robinson were later dropped after he was convicted of murder in this case." Id. In part because the witnesses did not testify as to their belief that Robinson was loving and respectful towards women, then, the resentencing jury never heard about this subsequent rape and robbery.[54] Given that this alleged robbery and rape happened only days after St. George's rape and murder, and that Robinson had another, prior conviction for rape, this mitigation evidence would certainly not have helped Robinson; indeed, it would have been devastating to his request for a life sentence.[55]

---

[54]Several of the other new mitigation witnesses who would have testified to attributes of Robinson's character, including his peaceful and non-violent ways, also could have opened the door to this devastating evidence. Even if the relationship-with-women testimony did not open the door to the subsequent rape and robbery, evidence that Robinson had been nice and respectful to three women would have done little to temper the other facts before the resentencing jury and the trial judge – that Robinson raped and murdered St. George while on parole for the rape of another woman.

[55]Robinson contends that, even if the evidence that he had positive relationships with women should not have been presented, his trial counsel should have at least uncovered that evidence and provided it to Krop so that Krop could have provided a "competent mental health examination." Krop, however, never indicated to Robinson's counsel that he needed more information or was otherwise uncomfortable rendering his initial diagnosis with the information he had. More importantly, Robinson does not argue how he was prejudiced during resentencing by his trial counsel's failure to provide Krop with this relationship-with-women evidence (or any other evidence presented in the 3.850 proceedings). In addition, if Krop had relied on this relationship-with-women evidence, it could have been brought out and also opened the door to the subsequent robbery and rape.

Moreover, Krop's modification of his initial diagnosis was minor. As the Florida

Finally, given the particularly egregious facts surrounding St. George's murder, the limited, noncumulative mitigation evidence (which is primarily Robinson's formal history of employment), would not have been so powerful as to affect the sentence in this case. As this Court has noted, "'[m]any death penalty cases involve murders that are carefully planned, *or accompanied by torture, rape or kidnapping*.'" Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998) (emphasis added) (quoting Jackson, 42 F.3d at 1369). "In these types of cases, this court has found that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." Id. (citing Francis , 908 F.2d at 703-04 (concluding that the failure to present mitigating evidence of a deprived and abusive childhood did not prejudice capital defendant at trial for torture-murder of government informant); Thompson v. Wainwright, 787 F.2d 1447, 1453 (11th Cir. 1986) (concluding that nothing trial counsel "could have

---

Supreme Court put it, even after his 3.850 review, "Krop still believes that Robinson has some type of personality disorder and still has some type of sexual disorder." Robinson III, 707 So.2d at 697. Indeed, during the 3.850 proceedings, Krop could not rule out his initial diagnosis that Robinson had an antisocial personality disorder. The Florida Supreme Court was not objectively unreasonable in its determination that Krop's minor modifications would not have affected the balance of mitigating and aggravating factors in this case when considered along with the new mitigation evidence and the five valid aggravators. We add an additional observation — Krop's 3.850 testimony that Robinson did not have a psychosexual disorder could actually have been harmful to Robinson's case for life; indeed, the trial court specifically found Robinson's psychosexual disorder to be a nonstatutory mitigating factor.

presented [during the penalty phase] would have rebutted the testimony concerning Thompson's participation in the brutal torture murder")).

Here, the capital offense was committed in the course of both a kidnapping and repeated rapes, and the resentencing jury and trial judge heard evidence that St. George was handcuffed from the start. Those handcuffs were removed when Robinson and Fields had sex with St. George, but even then, according to Fields, Robinson kept his hand on his gun. Fields also testified that St. George was asking whether she would be killed and "begging" not to be killed. This Court need not resolve what qualifies as a "torture" murder. But we are certain that, at least in the eyes of the resentencing jury, the taking at gun-point, handcuffing, raping three times, and then being shot twice in the head at point-blank range, were collectively acts that tortured St. George.

The rape, kidnapping, and other particular circumstances surrounding St. George's murder, then, lend further support for the Florida Supreme Court's determination that Robinson's sentence would have been the same, even if certain evidence of Robinson's formal work history, or other troubling aspects of his childhood, had been presented to the resentencing jury and trial judge. See Grayson, 257 F.3d at 1230 ("[W]e are confident that Grayson's sentence would have been the same despite the presentation of mitigating circumstances in light of

65

the brutality of the crime against an elderly widow who had been nothing but nice to him."); Tompkins, 193 F.3d at 1339 (concluding that there was no prejudice in capital case because aggravating circumstances surrounding strangulation of 15-year-old girl in the course of a sexual assault outweighed additional mitigating circumstances that could have been presented at sentencing concerning defendant's physical abuse as a child, substance abuse problems, and mental deficiencies); Clisby, 26 F.3d at 1057 (concluding that there was no prejudice from failure to present additional mitigating evidence at capital sentencing and stating, "[W]e are aware that, in reality, some cases almost certainly cannot be won by defendants. Strickland and several of our cases reflect the reality of death penalty litigation: sometimes the best lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder – or, even a less brutal murder for which there is strong evidence of guilt in fact.") (emphasis in original) (citing Strickland, 466 U.S. at 696); Daugherty v. Dugger, 839 F.2d 1426, 1432 (11th Cir. 1988) (concluding that "given the severity of the aggravating circumstances," failure to present psychiatric testimony was not prejudicial); Thompson, 787 F.2d at 1453 ("The testimony indicated that . . . Thompson . . . beat[ ] the victim with a chain, his fist, a chair leg, and a billy club . . . . [and] raped the victim with the chair leg and billy club. After hearing testimony that Thompson committed these

66

atrocities, the jury heard nothing from Thompson himself in reply . . . . We do not believe that there is a reasonable probability that evidence of a difficult youth, an unsavory codefendant, and limited mental capacity would have altered this jury's decision.").[56]

## IV. CONCLUSION

For the foregoing reasons, the district court properly concluded that the Florida Supreme Court's decision — that Robinson had not demonstrated the prejudice necessary to mandate relief — was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. See 28 U.S.C. § 2254(d)(1). Thus, we AFFIRM the district court's denial of Robinson's § 2254 petition.

---

[56]Robinson's reliance on Collier v. Turpin, 177 F.3d 1184 (11th Cir. 1999), is misplaced. Unlike this case, the murder in Collier did not involve a rape or kidnapping, or other facts present here. Instead, in Collier, "[t]he first two factors listed by the district court generally represent[ed] the aggravating circumstances of Collier's murder conviction: he killed a police officer while trying to prevent his arrest for the commission of another felony." Id. at 1203. The number of aggravating factors present in this case, in stark contrast to Collier, renders Collier a poor guidepost for determining whether the Florida Supreme Court was objectively reasonable in evaluating prejudice in this case. For similar reasons, Dobbs v. Turpin, 142 F.3d 1383 (11th Cir. 1998), also does not help Robinson.

EDMONDSON, Chief Judge, concurring in the judgment:

As I understand AEDPA, deciding this case accurately is no complicated or laborious task. I easily accept that the pertinent decisions of the Supreme Court of Florida were not contrary to and did not involve unreasonable applications of clearly established federal law.