[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 18, 2002
THOMAS K. KAHN
CLERK

No. 00-11998

_____

D. C. Docket No. 99-14063 CV-NCR

LEONARD WELLINGTON,

Petitioner-Appellant,

versus

MICHAEL MOORE,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(December 18, 2002)**

Before DUBINA and BARKETT, Circuit Judges, and HODGES*, District Judge.

DUBINA, Circuit Judge:

_____

*Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

Petitioner Leonard Wellington ("Wellington") brought a habeas corpus action pursuant to 28 U.S.C. § 2254 (2000), alleging that his trial counsel was ineffective for failing to obtain alibi testimony. The district court denied Wellington relief, finding that he could not demonstrate prejudice as a result of his counsel's deficient performance. We affirm.

## BACKGROUND

The State of Florida charged Wellington with the crimes of robbery with a deadly weapon and two counts of false imprisonment. After entering a not guilty plea, Wellington proceeded to trial where a jury found him guilty as charged. At trial, Detective Molly McIntyre testified that the police received the initial call regarding the robbery at the Rite Aid drug store at 9:56 p.m. When she arrived at the scene, she spoke with several individuals who gave her descriptions of the suspect whom the authorities later identified as Wellington. She also testified that later in her investigation, a detective from Fort Lauderdale, Florida, gave her reason to believe that Wellington might have been involved in the robbery.

John Locke ("Locke"), the manager of a Publix grocery store located near the Rite Aid store, testified at trial that a short time before the robbery, a black male entered the Publix asking to use the restroom. Locke described the black male as approximately 6 feet, 2 inches tall, weighing about 180 to 200 pounds,

2

with a moustache and shave "bumps" on his neck. Locke stated that the male wore a black baseball cap and a satin/silky suit that was brownish/copper in color. Locke looked at a photo line-up and identified Wellington as the man he saw on the night of the robbery. He commented that the moustache he saw on the night in question was different from the one shown in the photo line-up. Locke later picked the defendant out of a live line-up and, when he selected Wellington, stated that he "was very sure" that Wellington was the man he saw the night of the robbery. (R. Vol. 2, Exh. 5, p. 37). Looking at Wellington at trial, Locke stated that he was "positive" that he was the man he saw in the Publix that night. (*Id.* at 45).

Cynthia Waring, a Publix employee, testified at trial that on the night of the robbery, a black male bought sunglasses from her and she placed the sunglasses in a small brown paper bag. Jean Wade, the Rite Aid manager, testified that two days after the robbery, she found a small brown paper bag in the store and Rite Aid did not utilize such bags.

Vivan Gehringer ("Gehringer"), a Rite Aid employee and victim of the robbery, testified that on the night of the robbery, she noticed a black male with a black baseball cap enter the store. At first, she thought he appeared to be wearing glasses. Later, she saw that the glasses were wrap-around reflective lens sunglasses. When he approached her, he had an automatic nine millimeter

3

handgun which she recognized because her husband, who was a retired police officer, had a nine millimeter handgun. The man with the handgun asked Gehringer to take him to the office, so she led him in that direction. Another employee, Colleen Fahey ("Fahey") was in the office. The man told Fahey to get on the floor, turn her back to him, and not look at him. Gehringer stated that he instructed her to open the safe, which she did. Then he told her to turn around and not look at him. Out of the corner of her eye, she saw him put on gloves and put the money into a bucket. (*Id.* at 73). The man talked to Fahey, asking if she had children. When he finished, he told them not to do anything, wait a few minutes and then "do what you have to do." (*Id.* at 74). After he left, Gehringer called the authorities.

In describing the suspect, Gehringer stated that he had on a bronze, brown colored silk type shirt with long sleeves and no collar. He had a small growth on his upper lip and he was about 5 feet 10 inches to 6 feet tall and weighed about 185 pounds. Gehringer commented that the male was well-dressed and well-spoken. Ironically, she found him to be "soft-spoken" and "calm," with a "kind" voice. (*Id.* at 75). "He sounded like a very nice man." (*Id.*). Gehringer was unable to identify the suspect in a photo line-up, but at the live line-up, she identified Wellington by his voice. Gehringer stated that she narrowed it down to two men

4

and, after she asked them to speak, she knew the robber was Wellington. She stated that she was "100% sure" it was the robber's voice. (*Id.* at 77).

The State rested and the defense did not call any witnesses. Defense attorney George Allen ("Allen") presented the first and final closing arguments. After deliberating, the jury returned guilty verdicts on both counts.

Wellington appealed his case to the Florida District Court of Appeal, which affirmed without written opinion. *Wellington v. State*, 729 So. 2d 940 (Fla. Dist. Ct. App. 1999) (Table). Wellington filed a post-conviction motion pursuant to Rule 3.850, Florida Rules of Criminal Procedure (1999), arguing that his counsel was ineffective for failing to call Wellington's parents as alibi witnesses. The state trial court conducted an evidentiary hearing on Wellington's motion for post-conviction relief. The trial court denied his motion and, on appeal, the state appellate court affirmed. Wellington then filed a timely petition for habeas corpus relief in federal district court. A magistrate judge issued a report and recommendation, recommending that the district court deny Wellington's petition for relief. The district court adopted the magistrate judge's recommendation and denied Wellington a Certificate of Appealability ("COA"). This court granted a COA on the sole issue of whether Wellington's counsel was ineffective for failing to obtain alibi testimony.

5

**STANDARD OF REVIEW**

Wellington's petition for habeas corpus is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). Pursuant to 28 U.S.C. § 2254(d), a federal court may issue a petition for habeas corpus relief only if the state court's ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *see also Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). "Unless a state court decision is directly contrary to Supreme Court case law, we review state court findings of fact and conclusions of law for reasonableness." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1321 (11th Cir. 2002). We review *de novo* the district court's determination of whether the state court's findings and conclusions are reasonable. *Id.*

**DISCUSSION**

Since AEDPA governs this appeal, we must first determine whether the state court identified and applied the correct governing legal principles. We then consider whether the state court's application of the governing legal principles was

contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

## A. *Governing Legal Principles*

It is well established that the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), is the "controlling legal authority" to be applied to ineffective assistance of counsel claims. *Williams*, 529 U.S. at 406, 120 S. Ct. at 1512 (O'Connor, J., concurring). To succeed on a claim of ineffective assistance of counsel, the petitioner must show both incompetence and prejudice. *Chandler v. United States*, 218 F.3d 1305, 1312 (11th Cir. 2000) (*en banc*), *cert. denied*, 531 U.S. 1204 (2001). The petitioner's burden of demonstrating prejudice is high. Under the prejudice prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067. Instead, the petitioner "must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Chandler*, 218 F.3d at 1312-13 (quoting *Darden v. Wainwright*, 477 U.S. 168, 184, 106 S. Ct. 2464, 2473, 91 L. Ed. 2d 144 (1986)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

The state court correctly identified the *Strickland* standard in evaluating Wellington's claim of ineffective assistance of counsel. Thus, it applied the controlling legal principles, as required by AEDPA, in ruling on Wellington's claim of ineffective assistance of counsel.

*B. Contrary To*

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13, 120 S. Ct. at 1523 (O'Connor, J., concurring). The 'contrary to' clause "suggests that the state court's decision must be substantially different" from the controlling legal precedent. *Fugate v. Head*, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 122 S. Ct. 2310 (2002) (quoting *Williams*, 529 U.S. at 405, 120 S. Ct. at 1519). A state court's decision that applies the correct legal rule would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law. *See Williams*, 529 U.S. at 404-06, 120 S. Ct. at 1519-20 (O'Connor, J., concurring).

In this case, the state court, by correctly identifying *Strickland* as the controlling legal authority on claims of ineffective assistance of counsel, did not

reach an opposite conclusion from the Supreme Court on a question of law.

Further, Wellington does not cite to any decision in which the United States

Supreme Court, faced with materially indistinguishable facts, reached a decision

different from the state court in this case. Therefore, the state court's decision was

not 'contrary to' clearly established federal law as determined by the United States

Supreme Court.

### C. Unreasonable Application

We next consider whether the state court's decision involved an

"unreasonable application" of clearly established federal law as determined by the

United States Supreme Court. "Under the 'unreasonable application' clause, a

federal habeas court may grant the writ if the state court identifies the correct

governing legal principle from this Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 414, 120 S. Ct.

at 1523 (O'Connor, J., concurring). In deciding this issue, the federal court should

consider whether the state court's application of the law was objectively

unreasonable and should not apply the subjective all reasonable jurists standard.

*Id.* at 409-10, 120 S. Ct. at 1521-22. The Supreme Court recently adhered to its

pronouncements in *Williams*, stating that "we stressed in *Williams* that an

unreasonable application is different from an incorrect one." *Bell v. Cone*, 122 S.

9

Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002). The Court further noted that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Id.* (quoting *Williams*, 529 U.S. at 411, 120 S. Ct. at 1522 (O'Connor, J., concurring)).

Under the stringent *Williams* standard, we hold in the present case that the state court's determination that Wellington could not show that he suffered prejudice from his counsel's deficient performance[1] was reasonable. *See Brown*, 272 F.3d at 1313 ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). We now consider the "unreasonable application" prong.

At trial, Locke and Gehringer gave descriptions of a suspect that were similar – the suspect was wearing a black baseball cap and a satiny, brownish/copper suit. Locke said he had a moustache, and Gehringer said he had a small growth on a moustache. Locke said he was about 180 to 200 pounds, and Gehringer said he was about 185 pounds. Locke positively identified Wellington

---

[1] We need not discuss the performance deficiency component of Wellington's ineffective assistance claim because failure to satisfy the prejudice component is dispositive. *Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001), *pet. for cert. filed*, August 16, 2002 (No. 02-5967).

10

from a live line-up as the man who entered the Publix store shortly before the robbery at the Rite Aid. Gehringer positively identified Wellington at a live line-up by his voice.

At the Rule 3.850 hearing, Wellington's attorney, Allen, testified that he was aware of an alibi defense; he failed to file a notice of alibi; he failed to timely notify the State of Wellington's mother, Mary Ann Allen's ("Mrs. Allen"), availability to testify; and he failed to investigate Wellington's father, Herman Allen ("Dr. Allen") as a witness. He concluded that his decision not to call alibi witnesses "was not a tactical decision." (R. Vol. 2, Exh. 14, p. 20); *cf. Tarver v. Hopper*, 169 F.3d 710, 716 (11th Cir. 1999) (stating that a lawyer's "admissions of deficient performance" were not persuasive). Contradictorily, Allen also stated that although it was error not to call the alibi witness, he "thought [he] was making the best decision for [his] client at that time." (R. Vol. 2, Exh. 14, p. 16).

Mrs. Allen stated that she and her husband met with attorney Allen to discuss their availability as alibi witnesses. Mrs. Allen informed the attorney that Wellington was home with her and her husband on the night in question. She stated that they had "an agreement" that he would be home when he was supposed to be there. (*Id.* at p. 40). She had a meeting with the attorney to discuss her

11

"son's present incarceration." (*Id.* at 43). Mrs. Allen testified that the attorney told her that family members were not always the best witnesses.

Dr. Allen testified that he also told the attorney he was home with Wellington on the night in question. He stated that he "checked on [Wellington] to make sure that he was at home because [sic] probation officer was checking by and we just made sure that he stayed there." (*Id.* at 60). Dr. Allen could not clearly distinguish the night in question from any other night. Wellington, testifying at the hearing, stated that he told his attorney that he was home on the night of the robbery and his parents could confirm that fact. He also testified that he and his attorney discussed his decision not to testify. (*Id.* at 67).

Nikki Robinson Morgan ("Morgan"), the assistant state attorney who prosecuted Wellington, testified that when she reviewed the case file, Mrs. Allen's name was on the witness list. When Allen told her that Wellington's mother was going to testify as to alibi, Morgan told him that she would object because he did not file a notice of alibi. On the day of trial, Allen told Morgan that he was not going to call Wellington's mother and commented that he wanted to save his first and last argument.[2] Morgan thought that Allen's decision not to put on an alibi witness and to save his first and last argument was smart. (*Id.* at 92). Morgan also

_____

[2] This discussion between counsel was not a part of the trial record and Allen testified that he did not remember commenting to the prosecutor about the first and last argument.

12

commented that Dr. Allen's testimony would not have provided Wellington any help because he had nothing to offer. In all, Morgan thought Allen did a good job by impeaching the State's witnesses as far as the identification. She stated that, "I thought he was quite effective. And I thought he made smart strategic turns, decisions all the way through the trial." (*Id.* at 93).

As the trial court found, there is no reasonable probability that the alibi testimony would have changed the outcome of Wellington's trial. The State presented the testimony of one witness who positively identified Wellington as being in the vicinity shortly before the robbery and the testimony of a victim witness who was "100% sure" that Wellington was the man who robbed her. The victim witness identified Wellington by his voice, and the trial court found that Wellington did have a distinctive voice, just as Gehringer described. *See* 28 U.S.C. § 2254(e)(1) (factual determinations by a state court shall be presumed to be correct); *see also Robinson v. Moore,* ___ F.3d ___, No. 01-14273 (11th Cir. August 8, 2002). Moreover, as Gehringer testified, Wellington instructed her to lead him to the office and after she opened the safe, Wellington told her not to look at him. Because she was unable to see him during most of the robbery, Gehringer was not able to concentrate on Wellington's physical appearance as much as his voice.

Furthermore, as the prosecuting attorney noted, Dr. Allen's alibi testimony would not have been helpful. He was unable to distinguish the night of the robbery from any other night. Additionally, the fact that Mrs. Allen would have testified that her son was home on the night of the robbery would have been subject to cross-examination as to why she remembered that particular night so clearly. The prosecutor would have elicited the fact that Wellington's parents were keeping close watch over him because he was on probation.[3] As such, there is no reasonable probability that the alibi testimony would have changed the outcome of Wellington's trial. Accordingly, the trial court's application of *Strickland*'s prejudice prong was not objectively unreasonable.

## CONCLUSION

The state trial court correctly identified the *Strickland* standards as the governing legal principles to apply to Wellington's claim of ineffective assistance of counsel. The trial court's application of *Strickland* to Wellington's claim was

---

[3] Whether Mrs. Allen's testimony that her son was on probation would have lent credence to her testimony is clearly debatable. In fact, had Wellington's counsel called Wellington's mother as a witness, it is likely that she would have disclosed Wellington's prior conviction during her cross-examination. The damage to his defense would have outweighed any questionable value her alibi testimony would have provided. As the State's attorney noted at oral argument, the fact that he was debating that fact with the court bolsters the conclusion that the trial court's finding was not unreasonable.

14

neither "contrary to" nor an "unreasonable application" of clearly established federal law as determined by the United States Supreme Court.  Accordingly, we affirm the district court's judgment denying Wellington habeas relief.

AFFIRMED.

BARKETT, Circuit Judge dissenting:

Two witnesses tentatively identified Leonard Wellington as the man who robbed a Rite Aid store in Vero Beach, Florida, on April 8, 1995. On cross-examination, important questions were raised as to the reliability of these identifications. The state presented no additional evidence linking Wellington to the crime, and the defense rested on the argument that the state had failed to carry its burden. Despite the close case submitted to the jury, the majority finds no prejudice to Wellington in the failure of his counsel to present a readily available alibi defense. Wellington's jury was more discerning: it first reported that it was deadlocked four to two, and subsequently returned with a guilty verdict only after being advised to "try to reconcile your thoughts and reach a verdict if you can." In light of the weakness of the government's case, I am not at all confident that the same verdict would have been returned had the jury known of Wellington's alibi. I would accordingly grant Wellington the writ of habeas corpus he seeks.

## I.

Since losing his appeal, Wellington has pressed a single claim in state and federal courts. He argues that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment as a result of his trial counsel's accidental failure to call either or both of his parents to testify that he was at home in Fort

16

Lauderdale, at least two hours from Vero Beach, on the night of the robbery. At a post-conviction evidentiary hearing held pursuant to Wellington's motion under Rule 3.850 of the Florida Rules of Criminal Procedure, Wellington's trial counsel testified that the only reason he did not call Wellington's mother was that he had failed to comply with Rule 3.200 of the Florida Rules of Criminal Procedure, which authorizes the exclusion of alibi evidence if a defendant fails to provide timely notice of alibi and a list of alibi witnesses. When, on the morning of trial, the prosecutor informed Wellington's counsel she would object should he call his client's mother, Wellington's counsel decided to proceed rather than request a continuance or alternative remedy for the discovery violation. At the Rule 3.850 hearing, counsel admitted he had erred and stated that his handling of the alibi "was not a tactical decision."[4] (R. Vol. 2, Exh. 14, p. 20).

---

[4]The majority cites language from Tarver v. Hopper, 169 F.3d 710, 716 (11th Cir. 1999), to the effect that a lawyer's "admissions of deficient performance" were not persuasive. Majority Opinion at 11. It should be noted that this language did not state a general rule regarding the credibility of attorney admissions, but referred specifically to the admission of a particular attorney under particular circumstances. Nor did the Court in Tarver deem the attorney's admission to lack credibility; rather, it simply was not persuaded that counsel's performance had been deficient as a matter of law, despite the attorney's admission of having prepared inadequately. See Tarver, 169 F.3d at 716. The majority also characterizes as "contradictory" the statement of Wellington's trial counsel that he "thought [he] was making the best decision for [his] client" in proceeding to trial without the alibi. Counsel's remark appears to be simply an affirmation of good faith. Rather than contradict his statement denying the exercise of strategic judgment, it explains that his failure to present the alibi defense was an honest mistake.

The majority's citation of Tarver and its close parsing of testimony from Wellington's counsel is symptomatic of its broader tendency to defend counsel's performance despite expressly resolving, see Majority Opinion at 10 n.1, not to discuss this component of the ineffective assistance test of Strickland v. Washington, 466 U.S. 668 (1984). For example, the majority dwells upon

17

I agree with the majority that we may grant habeas relief if the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In making the "unreasonable application" inquiry, we ask whether the state court's application of clearly established federal law was objectively unreasonable. Williams v. Taylor, 529 U.S. 362, 409 (2000).[5]

As the majority recognizes, the "clearly established Federal law" that is relevant in this case is provided by Strickland v. Washington, 466 U.S. 668 (1984). Although the majority correctly states Strickland's "reasonable probability" standard, it bears emphasizing that this standard does not require the defendant to show that "but for counsel's errors, the outcome of the proceeding would more likely than not have been different." Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986). Rather, Wellington has met his burden of showing a reasonable

---

assistant state attorney Nikki Robinson Morgan's testimony at Wellington's Rule 3.850 hearing, in which she commented favorably upon the performance of Wellington's attorney at trial. Majority Opinion at 13. Such asides are irrelevant. The Rule 3.850 court did not hesitate to find that counsel's performance fell below an objective standard of reasonableness, and its determination in this regard was not questioned in either the Magistrate's Report or the district court order denying relief.

[5]In this respect, the district court did not employ the correct standard. Relying on the Fifth Circuit's decision in Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), and our decision in Neelley v. Nagle, 138 F.3d 917 (1998), the magistrate judge found that "an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect." Magistrate's Report and Recommendation at 7 (quoting Drinkard, 97 F.3d at 769.) That formulation of the inquiry was overruled by the Supreme Court in Williams.

18

probability of a different outcome if we cannot confidently say the case against him could have withstood introduction of the alibi evidence.  See id. at 1484.

Critical in assessing this likelihood are the infirmities in the state's case.  In failing to acknowledge the weakness of the evidence against Wellington, the majority disregards an elementary precept of the prejudice inquiry: our confidence in the verdict is necessarily less robust, and thus more readily undermined, the weaker the state's case is.  A "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  Strickland, 466 U.S. at 696.  When the government's case is weak, therefore, the "potential prejudicial impact of counsel's performance must be evaluated in light of that fact."  Johnson v. Baldwin, 114 F.3d 835, 838 (9th Cir. 1997); see also Gonzalez-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001) ("strength of the government's case" is factor to be considered in making prejudice determination); Cooks v. Ward, 165 F.3d 1283, 1296 (10th Cir. 1998) ("[i]n evaluating prejudice, we must keep in mind the strength of the government's case").  A defense attorney's unreasonable failure to present probative evidence in favor of his or her client will be more likely to prompt a finding of ineffective assistance when the state's case is not overwhelming.

Also relevant to our prejudice inquiry is any indication of indecision on the part of jurors. Signs of jury deadlock militate in favor of holding infirmities at trial to have prejudiced the defendant. See United States v. Shavers, 615 F.2d 266, 269 (5th Cir. 1980) (citing judge's need to exhort deadlocked jury to try to reach a verdict in rejecting argument that prosecutor's improper comment on defendant's silence was harmless error)[6]; United States v. Jean-Baptiste, 166 F.3d 102, 109 (2d Cir. 1999) (looking to indications of deadlock among jurors in holding wrongful admission of evidence not to have been harmless error).

II.

Applying these precepts, I cannot avoid the conclusion that the Rule 3.850 court's application of Strickland to the facts of this case was objectively unreasonable. As presented to the jury, the evidence that Wellington robbed the Rite Aid ultimately boiled down to a single piece of testimony: Rite Aid clerk Vivian Gehringer's assertion that she knew Wellington was the man who robbed her after he repeated the words "don't make me hurt you" at a lineup. (R. Vol. 2, Exh. 5, pp. 76-77, 82-83). Considered against the rest of the evidence at trial, I

---

[6]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

think it objectively unreasonable to conclude that Gehringer's professed certainty would have assured Wellington's conviction had jurors heard his alibi evidence.

First, the circumstances of Gehringer's voice-based identification raised concerns about the possibility of a misidentification. As the jury was correctly informed, the lineup was conducted almost two months after the robbery. Gehringer admitted at trial that she had earlier failed to identify Wellington from a photo line-up. At the live line-up, the reason she asked authorities to have Wellington and one other man repeat the threatening phrase, which she remembered from the robbery, was that she was unable to make an identification based on physical appearance alone. In fact, Gehringer admitted that she eliminated four members of the line-up not on the basis of facial structure, skin color, or distinguishing characteristics, but simply by reference to "the shape and the size that I remember." (R. Vol. 2, Exh. 5, p. 82). Of the two men she asked to repeat the phrase "don't make me hurt you," one spoke with a Spanish accent, which almost certainly led Gehringer to conclude that she must choose Wellington or no one.

More importantly, Gehringer's voice identification cannot have struck the jury with overwhelming force in the context of the trial as a whole, which provided jurors with strong reason to doubt the reliability of both Gehringer's identification

21

and that of the only other eyewitness. Despite Gehringer's testimony that she relied on her memory of the robber's build in excluding four members of the lineup, she testified at trial that she initially gave police a description of a suspect weighing about 185 pounds – significantly heavier than Wellington, who weighed 150 pounds. The only other eyewitness to identify Wellington, John Locke, testified that he had initially told police the man he encountered weighed at least 200 pounds; Locke himself weighed roughly 200 pounds at the time. Furthermore, both Gehringer and Locke reported that the robber stood between six feet and six feet two inches tall, whereas Wellington is five ten.

To be sure, these discrepancies did not prevent Gehringer and Locke from insisting at trial that they were confident Wellington was the assailant. As discussed above, Gehringer defended her identification by emphasizing her certainty of the match between Wellington's voice and the robber's.[7] Locke,

---

[7]Standing alone, Gehringer's statement of confidence in her voice identification may or may not have impressed the jury. Yet the Rule 3.850 court's finding that Wellington does in fact have a distinctive voice is inapposite because there is no indication in the record that the jury ever heard his voice. In citing the state court's finding with approval, the majority fails to consider that Wellington never testified at trial. Nor would introduction of his alibi defense necessarily have occasioned his testimony. Therefore, in assessing whether the alibi defense would have created a reasonable probability of acquittal, we may have reference only to Gehringer's uncorroborated insistence that Wellington's voice matched that of the robber.

Even assuming the jury was impressed by Gehringer's uncorroborated statements of certainty, it is extremely difficult to remain confident that jurors relying on this single shred of proof would not have been troubled by introduction of the alibi evidence. For this reason I believe we must find the state court to have reached an objectively unreasonable conclusion in determining that the alibi evidence does not present a reasonable probability of a different outcome.

however, suffered fairly dramatic impeachment after insisting he was "100 percent" certain Wellington was the right man. (R. Vol. 2, Exh. 5, p. 36). Defense counsel asked Locke, who is four inches taller than Wellington, to stand face-to-face with the defendant at a distance of about 18 inches, the same distance Locke reported having stood from the suspect on the date of the crime. Counsel then asked whether Locke could explain his earlier statement that he and the robber were about the same height, forcing Locke to admit that "[h]eight-wise I might not have been correct on it." (Id. at 39). Additional impeachment drew attention to Locke's earlier estimate of the assailant's weight as exceeding 200 pounds. Finally, counsel elicited Locke's equivocal statement at the lineup, "if I had to pick somebody, I'd pick [Wellington]." (Id. at 44).

Both Locke and Gehringer provided reasonably similar accounts of the suspect's somewhat distinctive clothing, agreeing that he was well-dressed in a copper or brown shirt with an unusual collar. The concordance of these accounts was ultimately of little probative value, however, because the state never linked this clothing to Wellington. The only relevance of the matching clothing description was its tendency to prove that Locke, who was not an eyewitness to the robbery itself, had encountered the robber shortly before the crime's commission in a Publix store located in the same shopping plaza. The jury may well have

23

believed the man Locke met to have been the robber, but the discrepancies between Locke's description and Wellington's appearance substantially undermined the significance of this proof.[8]

Finally, the jury may have been struck by the absence of testimony from several additional eyewitnesses mentioned at trial by eyewitness Gehringer, Publix employee Cynthia Waring, and Detective Molly McIntyre. Gehringer described a sustained interaction between the robber and Rite Aid employee Colleen Fahey, stating that the robber asked Fahey whether she had children and Fahey answered him. Despite hearing the robber speak, Fahey never testified at trial. To the contrary, Detective McIntyre acknowledged in her own testimony that Fahey was unable to identify anyone in either the photo or the live lineup; in fact, Fahey affirmatively stated that the person who committed the robbery was not in the lineup. The jury was likewise left to speculate as to why Waring, who recounted a colloquy between herself and the alleged robber as she sold him a pair of sunglasses, never identified Wellington as the man in question. Testifying witnesses also referred to an additional Publix employee, named Robert Kimbra or

---

[8] A similar point applies to testimony from witnesses Cynthia Waring and Jean Wade, employees at Publix and Rite Aid respectively, which linked a small paper bag recovered from the Rite Aid with a Publix bag used in a sale of sunglasses to the man encountered by Locke shortly before the robbery. This testimony of Waring and Wade tended only to prove that this man was the robber. But since Locke's identification of Wellington as the man who bought the sunglasses was itself uncertain, the testimony from Waring and Wade was of little value.

Kimber, who encountered the alleged robber at the same time as Locke. (R. Vol. 2, Exh. 5, pp. 16, 52-53). Yet the state never offered the jury any account of this witness's nonappearance. Finally, just as the state failed to produce a number of witnesses who might have been expected to identify Wellington, it failed to produce any physical evidence linking Wellington to the crime.

At the end of the state's case, therefore, the jury had before it a closely joined contest in which a single issue, identification, would determine the verdict. As it happened, the jury had a difficult time reaching a decision. After deliberating for about an hour and a half, it reported that it was deadlocked. The judge then administered a charge using language similar to that approved in <u>Allen v. United States</u>, 164 U.S. 492, 501-02 (1896), exhorting jurors as follows: "You should consider each other's views and try to reconcile your thoughts and reach a verdict if you can. So please deliberate until you feel you cannot agree on a verdict." (R. Vol. 2, Exh. 5, pp. 177-80). Only after deliberating for another hour and a half did the jury return with a guilty verdict.

It is against this context that prejudice resulting from the deficient performance of Wellington's counsel must be considered. Wellington's attorney could have introduced the testimony of Wellington's mother and father, Mary Ann Allen and Dr. Herman Allen, that their son was at home in Fort Lauderdale, at least

25

two hours from the scene of the crime, on the evening in question.  It is of course true that the Allens' interest in seeing their son acquitted would have provided the state with an effective line of impeachment.  But testimony adduced at the Rule 3.850 hearing shows that the Allens, and Mary Ann in particular, would not have been silenced by interrogation along these lines.  Throughout the course of her cross-examination at the Florida Rule 3.850 hearing, Mary Ann Allen was steadfast in maintaining that she clearly recalled her son's presence at home on April 8, 1995, a Saturday, because they had a discussion about attending Palm Sunday services the next morning.[9]  (R. Vol. 2, Exh. 14, pp. 45-46, 55). She also described keeping a calendar of Wellington's coming and goings for the purpose of responding honestly to inquiries from his probation officer.

### III.

In light of the substantial weaknesses in the state's case and the existence of potentially decisive alibi evidence, I think it unreasonable to reject Wellington's claim that presentation of his alibi would have created a reasonable probability of acquittal.  With the reliability of eyewitness identifications looming so large, deliberations seem virtually certain to have canvassed the question of why there

---

[9]The prosecutor at Wellington's trial, Nikki Robinson Morgan, testifed at the Rule 3.850 hearing that April 8th was in fact the day before Easter, not Palm Sunday.  (R. Vol. 2, Exh. 14, p. 91).  This contention was mistaken.  See The World Almanac and Book of Facts 2002, at 686 (identifying Easter Sunday as falling on April 16, 1995).

was no evidence as to where Wellington was on the night of the robbery. Indeed, we know from the court's modified <u>Allen</u> charge that the jury did struggle with the task before it. Even without such indications of deadlock, we have previously found prejudice in an attorney's failure to present an alibi when the state produced not only two eyewitness identifications but also the inculpatory testimony of an alleged accomplice. See <u>Code</u>, 799 F.2d at 1484.

The majority nonetheless concludes there is no reasonable probability that alibi testimony would have changed the outcome of Wellington's trial. In support of this assertion it reasons that because Wellington's mother "likely. . . would have disclosed Wellington's prior conviction," her testimony would have caused "damage to his defense [that] would have outweighed any questionable value her alibi testimony would have provided." Majority Opinion at 14 n.3. This remark is both misguided and unpersuasive.

It is misguided in that it implies our inquiry into <u>prejudice</u> under <u>Strickland</u> may take account of the possibility that Wellington's jury would have convicted him on the basis of improper inferences drawn from the plain disclosure of a prior conviction. Such inferences are forbidden under the Federal Rules of Evidence, which propound a variety of strictures that aim to reduce the danger they will be drawn. See Fed. R. Evid. 404(b) (barring evidence of uncharged crimes when

27

offered "to prove the character of a person in order to show action in conformity therewith"); compare Fed. R. Evid. 609(a) (barring admission of defendant's prior conviction unless judge determines that "the probative value of admitting this evidence outweighs its prejudicial effect") with Fed. R. Evid. 403 (allowing admission of other types of potentially prejudicial evidence so long as prejudice does not "substantially outweigh[]" probative value); see also Old Chief v. United States, 519 U.S. 172 (1997) (finding abuse of discretion in trial court's refusal to allow defendant to stipulate to prior felony conviction so as to keep jury from learning of prior assault similar to one charged).  It has been established since the Supreme Court's decision in Strickland that our inquiry into prejudice must presume the trier of fact to comply with the dictates of law.  As the Supreme Court then stated:

> The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.

Strickland, 466 U.S. at 495.  More recently, the Supreme Court has reiterated this point, clarifying that the prejudice inquiry excludes "considerations that, as a

28

matter of law, ought not inform the inquiry." Williams, 529 U.S. at 393 n.18

(quoting Lockhart v. Fretwell, 506 U.S. 364, 373 (1993) (concurring opinion of

O'Connor, J.)).[10]  Our prejudice inquiry properly concerns itself with the weight of

competent evidence that was presented at trial or that would have emerged had

counsel not performed deficiently.  It does not credit the possibility, real though it

may be, that a defendant would have been convicted as a result of a propensity the

law aspires to contain.

Moreover, even were the majority correct in weighing the possibility that

jurors would have relied on improper considerations, its observation regarding how

Wellington's prior conviction factors into the prejudice inquiry is less than

compelling.  The majority offers no support for its assumption that Mary Allen's

reference to her son's probationary status would have enabled the state to elicit

information about his prior conviction.  Since Wellington was not himself

testifying, the conviction could not be admitted as evidence of his own credibility.

Nor is there any suggestion that the conviction would be admissible as relevant to a

---

[10]These remarks are fully applicable to the question before us, even though the quoted language emerged out of defendants' efforts to establish prejudice on the basis of a failure by counsel to take advantage of a "windfall" opportunity created by a court's mistake of law.  See Lockhart v. Fretwell, 506 U.S. 364 (1993).  The Court's language refers not simply to the possibility of an improper acquittal, but to the prejudice inquiry as such.  This broad framing of the rule is wholly appropriate, since the state obviously has no more claim than a defendant to an outcome that rests on a decisionmaker's lawlessness.

question, such as intent, identified by Federal Rule of Evidence 404(b) as an independent basis for admitting evidence of prior crimes and bad acts. There is likewise no indication in the record of any legitimate basis for the introduction of evidence regarding the nature of the crime underlying the conviction, nor does the state argue that one exists. As to Wellington's probationary status itself, Mary Allen's candor regarding why she paid close attention to her son's comings and goings might well have counter-balanced curiosity among jurors as to Wellington's prior misadventures.

The majority admits that disclosure of Wellington's probationary status might have served to bolster Mary Allen's credibility and thus Wellington's alibi, characterizing the question as "clearly debatable." Yet the majority then employs this characterization to support the conclusion that the Rule 3.850 court's finding was not objectively unreasonable. Majority Opinion at 14 n.3. This pat solution to the doubt raised by Allen's post-trial testimony fails to come to grips with the reality that Wellington's guilt was "clearly debatable" well before he brought his alibi to the attention of the courts. The case against Wellington was too close, and too focused on the question of identity, to assume away the potentially decisive impact of an alibi by summarily dismissing Allen's alibi testimony as being of "questionable value."

I recognize that 28 U.S.C. § 2254(d)(1) requires us to determine not whether the Florida post-conviction court's prejudice determination was incorrect but whether it was objectively unreasonable.  Bell v. Cone, 122 S. Ct. 1843, 1850 (2002) (citing Williams, 529 U.S. at 409-10).  In my view, however, the doubt cast at trial upon the eyewitness identifications – and thus the entirety of the state's case – shows the post-conviction court's application of Strickland's prejudice prong to have been objectively unreasonable in this case.  When the prejudice inquiry is undertaken, as it must be, in light of the weakness of the state's case and the indications of jury deadlock, a reasonable probability that Wellington's alibi evidence would have led to a different result must be recognized.

For the foregoing reasons, I would reverse the decision of the district court and grant the writ of habeas corpus.